Lawrence C. Weiner, Esq.
Ryan M. Buehler, Esq.
MANDELBAUM SALSBURG, P.C.
3 Becker Farm Road
Roseland, NJ 07068
Ph.:  973-585-3154
Fax: 973-736-4670
lweiner@lawfirm.ms
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---

EMQORE ENVESECURE PRIVATE CAPITAL TRUST,

              Plaintiff,

        v.

BHAVDEEP SINGH; FORTIS HEALTHCARE LTD.;
EAST BRIDGE CAPITAL MASTER FUND LTD.;
EAST BRIDGE CAPITAL MASTER FUND I LTD.;
EAST BRIDGE CAPITAL MANAGEMENT LP;
FORTIS HEALTHCARE HOLDINGS; IHH
HEALTHCARE BERHAD; KHAZANAH NASIONAL
BERHAD; NORTHERN TKVENTURE PTE. LTD.;
RHC HOLDINGS PRIVATE
LTD.; RHC HEALTHCARE PRIVATE LTD.;
SRL LIMITED; RELIGARE ENTERPRISES LTD.;
RELIGAREFINVEST LTD.; LAKSHMI VILAS BANK;
RANCHEM PRIVATE LIMITED; NEW YORK
LIFE INVESTMENT MANAGEMENT, LLC;
INTERNATIONAL FINANCE CORPORATION;
SIGULER GUFF & COMPANY, LP; BAY CAPITAL
ADVISORS PVT. LTD; SSG CAPITAL MANAGEMENT
LTD.; INDIA HORIZONS FUND LTD.; RESILIENT
INDIA GROWTH FUND; RELIGARE HEALTH TRUST;
SIDDHARTH MEHTA; SHAM MAHESHWARI; RAVI
RAJAGOPAL; and ABC CORP. (1 – 10) (fictitious entities),

**COMPLAINT**

              Defendants.

---

1

Plaintiff Emqore Envesecure Private Capital Trust ("Plaintiff" or "Emqore"), by way of Complaint against Defendants states, as follows:

## OVERVIEW

1.     This case involves a complex scheme by Defendants comprised of a multitude of transactions and feigned transactions each designed to cover-up Defendants' actions and inactions, obfuscate the facts and deprive Plaintiff and Plaintiff's predecessors, Strategic Credit Capital Pvt. Ltd. ("Strategic"), Participation Finance & Holdings (India) ("PFH"), Loancore Servicing Solutions Private Limited, Loancore Limited, Walmark Health Private Limited, and Walmark Holdings Limited (collectively, "Plaintiff's Predecessors"), of the benefit of their bargain.

2.     The management and control of the racketeering scheme, along with the funds which made the scheme possible, derived in substantial part from Defendants located in the United States, which reaped the rewards of the illegal enterprise.  In an effort to cover-up Defendants' gross negligence and complicity in a fraud perpetrated by Malvinder and Shivinder Singh ("the Singh Brothers"), who are now in prison for their crimes, Defendants concocted an illegal fraudulent scheme of their own to shirk their responsibility.

3.     After Plaintiff's Predecessors entered into agreements to purchase certain interests and assets in the Religare entities and the Fortis entities, Plaintiff's Predecessors identified frauds above and beyond the criminal activity of the Singh Brothers.

4.     Plaintiff's Predecessors' discovery of the various Defendants' active roles or complicity in the criminal activity of the Singh Brothers meant that Defendants must cover-up their own involvement or become implicated in the Singh Brothers' scheme.

5.     As set forth in detail below, upon learning that Plaintiff's Predecessors were discovering Defendants' involvement with the Singh Brothers, Defendants took fraudulent steps

to cover their involvement in the scheme by filing sham lawsuits against the Singh Brothers, which drove the value of the companies down, reducing the share prices for REL and Fortis Ltd. Defendants sought to cover-up their willful blindness or contrived ignorance relating to the Singh Brothers' fleecing of the entities.

6.      Moreover, Defendants replaced board members of the entities in furtherance of the scheme to shield their involvement with the Singh Brothers from the light of day.

7.      Having driven the value of the entities down and replacing board members, Defendants then illegally reneged on the agreements with Plaintiff's Predecessors and took over control of the Religare and Fortis entities through self-dealing.

8.      Defendants swindled Plaintiff's Predecessors out of the deals because Plaintiff's Predecessors uncovered Defendants' participation in the Singh Brothers' scheme.

**PARTIES**

a.      **Plaintiff**

9.      Plaintiff Emqore Envesecure Private Capital Trust is trust settled under the laws of Wyoming with a principal place of business at 1712 Pioneer Avenue, Suite 387, Cheyenne, Wyoming 82001.

10.     By Assignment Deed, plaintiff Emqore acquired all rights, title and interest  of Loancore Servicing Solutions Private Limited, Loancore Limited, Walmart Health Private Limited, Walmark Holdings Limited, Stratgala AG and Emqore OU in the contracts, agreements, arrangements, understandings, and commitments relating to the following: brands of Religare; rights in the shareholding of Elive Infotech Private Limited ("Elive"); funding from LVB Bank ("LVB"); proceeds of any put option or purchase option provided by Religare Enterprises Limited ("REL"); proceeding, actions or remedies against REL or Religare Finvest Limited ("RFL")

3

pertaining to the brands or LVB pertaining to any funding commitments; and beneficial interest in any penalty fee agreement or other assurances provided by REL.

11.     Strategic Credit Capital Pvt. Ltd. ("Strategic") is an Indian company with a business address at A49 Mohan Cooperative Industrial Area, New Delhi 110044.

12.     Participation Finance & Holdings (India) ("PFH") is an Indian company with business addresses at Number 1 Subhash Nagar, Dehradun, Uttranchal 248002 and A49 Mohan Cooperative Industrial Area, New Delhi 110044.

13.     On February 18, 2019, Strategic and PFH assigned their rights, title, and interest to Loancore Servicing Solutions Private Limited for contracts, agreements, arrangements or understandings relating to the following: the brands of Religare; any rights in the shareholding of Elive Infotech Private Limited; funding from LVB; proceeds of any put options or purchase option provided by Religare Enterprises Limited for the acquisition of the brands; proceeding, actions or remedies against Religare Enterprises Limited pertaining to the brands or LVB Bank pertaining to funding commitments.

14.     On February 18, 2019, PFH assigned all rights, title and interest to Walmark Health Private Limited for contracts, agreements, arrangements or understandings relating to the following: the brands of Fortis Healthcare Limited, including but not limited to "Fortis" La Femme" and "SRL"; costs, fees, causes of action or claims against Fortis Healthcare Limited and Fortis Healthcare Holdings Limited; proceeds of any put options or purchase option provided by Fortis Healthcare Limited and Fortis Healthcare Holdings Limited; proceeding, actions or remedies against Fortis Healthcare Limited and Fortis Healthcare Holdings Limited or RHC Healthcare Management Private Limited

**b.     <u>Defendants</u>**

### i.    Fortis Defendants

15.    Defendant Bhavdeep Singh is an individual with an address of 56 Walsh Dr., Mahwah, New Jersey and at all relevant times herein was Chief Executive Officer of Defendant Fortis Health Care Limited.

16.    Defendant Ravi Rajagopal is an individual with an address at Unitech Business Park, A, Netaji Subhash Marg, Block F, South City I, Sector 41, Gurugram, Haryana 122001, India.

17.    Defendant Fortis Healthcare Ltd. ("Fortis Ltd.") is a public company with a business address at Tower A, Unitech Business Park, Block – F, South City 1, Section – 41, Gurgaon, Haryana - 122001.

18.    Defendants East Bridge Capital Master Fund Ltd. and East Bridge Capital Master Fund I Ltd. (collectively "East Bridge") are affiliates of defendant East Bridge Capital Management LP, which is a Delaware limited partnership with a business address at 1 Financial Center, Boston, Massachusetts.

19.    Defendants East Bridge Capital Master Fund Ltd. and East Bridge Capital Master Fund I Ltd. are shareholders of defendant Fortis Ltd.

20.    Defendant Fortis Healthcare Holdings ("Fortis Holdings") is an Indian company with a business address at Tower A, Unitech Business Park, Block – F, South City 1, Section – 41, Gurgaon, Haryana - 122001.

21.    Defendant IHH Healthcare Berhad ("IHH Berhad") is a Malaysian company with a business address at Level 11 Block A, Pantai Hospital Kuala Lumpur, 8 Jalan Bukit Pantai, 59100, Malaysia.

4830-6474-5405, v. 9

22.     Defendant, Khazanah Nasional Berhad ("Khazanah") is a sovereign wealth fund, with a business address at Level 22, Mercu UEM, Jalan Stesen Sentral 5, Kuala Lumpur Sentral 50470 Kuala Lumpur.  Upon information and belief, Khazanah is part of an investigation by the United States Department of Justice in the Southern District of New York regarding the 1Malaysia Development Berhad fraud. Upon information and belief, Khazanah is one of the largest shareholders in IHH Berhad and at all relevant times was the majority shareholder of IHH Berhad.

23.     Defendant Northern Tk Venture Pte. Ltd. ("NTVP") is a Singaporean company with a business address at 111, Somerset Road, # 15-01, TripleOne Somerset, Singapore 238164.

24.     Defendant RHC Holdings Private Limited ("RHC Holdings") is an Indian company with a business address at 54, Connaught Place, Janpath, New Delhi, Delhi 110001.  RHC Holdings is the private investment vehicle of the Singh Brother and also the parent company of Fortis Holdings that in turn was the majority shareholder of Fortis Ltd.

25.     Defendant RHC Healthcare Management Services Private Ltd. ("RHC Healthcare") is an Indian company with a business address at 54, Connaught Place, Janpath, New Delhi, Delhi 110001.

26.     Defendant SRL Limited ("SRL") is an Indian company and a subsidiary of Fortis Ltd.  with a business address at GP-26, Maruti Industrial Est Udyog Vinar, Sector – 18, New Delhi, 122015 India.

**ii.     Religare Defendants**

27.     Defendant Religare Enterprises, Ltd. ("REL") is an Indian company with a business address at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi - 110019.

28.     Defendant Religare Finvest Ltd. ("RFL") is an Indian company with a business address at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi - 110019.

6

29.     Defendant Lakshmi Vilas Bank ("LVB") is an Indian company with a business address at No. 4, Sardar Patel Road, Guindy, Chennai – 600 032 Tamil Nadu.

30.     Defendant Ranchem Private Limited ("Ranchem") is an Indian company with a business address at G-16, Marina Arcade, Connaught Circus, New Delhi - 110001.

31.     Defendant New York Life Investment Management, LLC ("NYLIM") is a limited liability company with a business address at 30 Hudson Street, Jersey City, New Jersey.  Defendant NYLIM owned approximately 7% of Defendant RFL through NYLIM Jacob Ballas India Fund III LLC and maintained board representation in RFL. Upon information and belief, NYLIM also holds an equity interest in SRL and continues to enjoy board representation in SRL.

32.     Defendant International Finance Corporation ("IFC") is a member of the World Bank Group with a business address at 2121 Pennsylvania Ave., NW, Washington, DC 20433.  At all relevant times, IFC owned substantial shares in Defendant REL, and IFC maintained a representative on REL's Board of Directors until on or about April 24, 2017.  Defendant IFC also holds an equity interest in Defendant SRL.

33.     Defendant Siguler Guff & Company, LP ("Siguler") is a United States company with a business address at 200 Park Ave., 23rd Floor, New York, NY 10166.  At all relevant times, Siguler owned approximately 6% in Defendant RFL through Resurgence PE Investments Limited (formerly known as Avigo PE Investments Limited).  Siguler also holds an equity interest in SRL.

34.     Defendant Bay Capital Advisors Pvt. Ltd. ("Bay Capital") is an Indian company with a business address at Bakhtawar, 14th, Nariman Point, Mumbai, Maharashtra 400021, India.

35.     Defendant Siddarth Mehta is an individual with an address at 19 Berkeley Street, Mayfair, London, W1J 8ED, United Kingdom.

36.     Defendant SSG Capital Management Ltd. ("SSG") is a Hong Kong company with a business address at 42/F Gloucester Tower, 15 Queens Road Central, Hong Kong.

37.     Defendant Sham Maheshwari is an individual with an address at Rooms 4202-4204, 42/F, Gloucester Tower, The Lnadmark, 15 Queens Road Central, Central, Hong Kong.

38.     Defendant India Horizons Fund Ltd. ("IHF") is a Mauritian company with a business address at C/O Apex Fund Services (Mauritius) Ltd., 4th Floor, 19 Bank Street, Cybercity, Ebene, Mauritius O4 72201.

39.     Defendant Resilient India Growth Fund ("RIGF") is an Indian company.

40.     Defendant Religare Health Trust ("RHT") is a Singaporean company with a business address at 80 Raffles Place, #11-20 UOB Plaza 2, Singapore.

## JURISDICTION

41.     This action involves a matter in controversy which exceeds the sum or value of $75,000, exclusive of interest and costs.

42.     The citizenship of Emqore is diverse from the citizenship of all Defendants .

43.      Defendant Bhavdeep Singh is a resident of New Jersey.

44.     Defendant Ravi Rajagopal has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Ravi Rajagopal, a nominee of East Bridge and Chairman of the Board of Fortis, was a co-conspirator who participated in the scheme with Bhavdeep Singh and directed acts in furtherance of the scheme in New Jersey.

45.     Defendant Fortis Ltd. has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More

specifically, Fortis Ltd., through its Chief Executive Officer, performed acts in furtherance of the scheme within New Jersey.

46.     Defendants Fortis Ltd. and Fortis Holdings have certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Fortis Ltd. and Fortis Holdings, through Fortis Ltd.'s Chief Executive Officer, performed acts in furtherance of the scheme within New Jersey.

47.     Defendants East Bridge and East Bridge Capital Management LP, have certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, East Bridge and East Bridge Capital Management LP were substantial shareholders of Fortis Ltd. who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme within New Jersey.

48.     Defendant IHH Berhad has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, IHH Berhad was a co-conspirator who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme in New Jersey.

49.     Defendant NTVP has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, NTVP was a co-conspirator who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme in New Jersey.

50.     Defendant RHC Holdings has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RHC Holdings was a co-conspirator who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme in New Jersey.

4830-6474-5405, v. 9

51.     Defendant RHC Healthcare has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RHC Healthcare was a co-conspirator who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme in New Jersey.

52.     Defendant REL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, REL, through its significant shareholder and co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

53.     Defendant RFL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RFL, through its significant shareholder and co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

54.     Defendant LVB has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, LVB, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

55.     Defendant Ranchem has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Ranchem, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

56.     Defendant NYLIM is domiciled in New Jersey.

57.     Defendant IFC has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More

specifically, IFC, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

58.     Defendant **Siguler has** certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Siguler, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

59.     Defendant **Bay Capital has** certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Bay Capital, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

60.     Defendant **Siddarth Mehta has** certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, **Siddarth Mehta, the CIO of Bay Capital,** through his dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

61.     Defendant **SSG has** certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, SSG, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

62.     Defendant **Sham Maheshwari has** certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, **Sham Maheshwari, a principal of SSG,** was a co-conspirator who

through his dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

63.     Defendant IHF has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, IHF, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

64.     Defendant RIGF has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RIGF, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey.

65.     Plaintiff Emqore is a Wyoming trust and completely diverse to all Defendants.

66.     This Court has diversity jurisdiction pursuant to 28 U.S.C.A. § 1332.

67.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C.A. § 1964.

68.     This Court has supplemental jurisdiction over this action pursuant to 18 U.S.C.A. § 1367(a).

## VENUE

69.     Bhavdeep Singh and NYLIM are domiciled in the District of New Jersey.

70.     Venue of this action is proper in the United States District Court for the District of New Jersey by virtue of 28 U.S.C.A. § 1391(b)(3).

## FACTS COMMON TO ALL COUNTS

I.     **Background**

71.     In or about 2008, the **Singh Brothers sold their majority-stake in** Ranbaxy Limited ("Ranbaxy"), India's leading pharmaceutical company, to Daiichi Sankyo of Japan.

72.     Upon information and belief, the Singh Brothers formed REL and Fortis Ltd. utilizing the proceeds of the sale of their shares in Ranbaxy.

73.     In or about 2016, Daiichi Sankyo commenced an arbitration proceeding against the Singh Brothers based upon the Singh Brothers' concealment of information prior to and following the sale of their shares.   More specifically, Daiichi alleged that the Singh Brothers concealed information and fabricated data relating to the number of Ranbaxy products granted approvals by the United States Food and Drug Administration.

74.     In 2016, Daiichi Sankyo obtained a $500 million award in the arbitration and India's Supreme Court upheld the award.

75.     Daiichi Sankyo aggressively pursued collection activities against the Singh Brothers.

76.     However, by that time, REL and Fortis Ltd, the fruit of the Singh Brothers' criminal activities, had grown into financial giants commanding market capitalizations of approximately $3 billion each.

77.     At the same time, the Board of Directors of REL and Fortis Ltd. were comprised of people selected and appointed by Mr. Gurmeet Singh Dhillon ("Dhillon") the uncle of the Singh Brothers.

78.     Dhillon exercised unrivalled influence over the operations of REL and Fortis Ltd. since their inception.

79.     Additionally, the Singh Brothers siphoned funds and misused the resources of REL and Fortis Ltd.

13

80.     At the time the Singh Brothers were siphoning funds from REL and Fortis Ltd., representatives of some of the United States' leading financial institutions, including NYLIM, IFC, Siguler and East Bridge, sat on the Board of REL and Fortis Ltd. and their subsidiaries and approved sham loan transactions to the Singh Brothers of approximately $500 million.

81.     Upon information and belief, the Board Members permitted the Singh Brothers' fund siphoning and then evergreening of the loans through funds from either REL and Fortis Ltd.

82.     REL and Fortis Ltd. rotated the evergreened loans just before the financial year closing in order to give the false appearance of repayment. These nefarious accounting practices of REL and Fortis Ltd. resulted in books and records with false financial information for multiple reporting periods, which grossly inflated the value of the entities.

83.     Defendants, one or more of them, prepared documentation that did not accurately reflect the true nature of the arrangements with the criminal Singh Brothers and the misrepresentations to members of management and the regulators was fraudulent.

84.     In or about 2016, and running out of ways to scam their own enterprises, the Singh Brothers decided to sell substantial stakes in REL and Fortis Ltd. to outside investors and appointed bankers to undertake these stake sales.

85.     Upon information and belief, after at least one potential investor backed out of a deal to purchase stakes in REL and Fortis Ltd. in 2017, representatives of Plaintiff's Predecessors were introduced to REL and Fortis Ltd.

86.     To bring Plaintiff's Predecessors to the negotiating table, REL and Fortis Ltd. presented a package of inducements and incentives, which would have guaranteed Plaintiff an upfront upside and also a breakup fee in the event the transaction failed. Plaintiff commenced an engagement with REL and Fortis Ltd.

## II.  **The Religare Shares Scheme**

87.     Loancore is a subsidiary of Institute of Structure Design Private Limited ("ISD") and was established by the Ekahi Group[1] to invest in REL.

88.     On or about May 21, 2014, SGGD Projects Development Private Ltd. ("SGGD"), Bestest Developers Private Limited ("Bestest") and Shabnam Dhillon ("Dhillon") executed a Debenture Trust Deed whereby listed, rated, principal, protected, redeemable non-convertible debentures ("NCDs") each of face value of Rs. 10,000,000 (Rupees One Crore)[2] consisting of Debenture Series B aggregating to Rs. 1,850,000,000 ("Series B NCDs") were issued to One Investment Opportunities II Pte. Ltd. ("OIO").

89.     OIO is the holder of the Series B NCDs.

90.     IDBI Trusteeship Services Ltd. ("IDBI"), at all relevant times herein, acted on behalf of OIO.

91.     In order to secure the NCDs, on September 12, 2016, SGGD, Bestest and Dhillon executed a Share Pledge Agreement pledging an aggregate of 27,568,309 shares of REL in favor of IDBI ("Pledge Agreement").

92.     In or about November 2016, LVB Bank funded a loan in the amount of approximately Rupees 750 Crores to RHC Holdings and Ranchem  against the fixed deposits of RFL ("the RFL Loan").

93.     In August 2017, Loancore and REL began discussions regarding Loancore taking over REL.

---

[1] The Ekahi Group is headquartered in Germany and Estonia and operates family offices out of Germany, Estonia and Sweden.

[2] 1 crore is worth approximately $150,000 (USD).

4830-6474-5405, v. 9

94.     In or about September 2017, LVB set off the fixed deposits of RFL associated with the RFL Loan.

95.     On September 12, 2017, JP Morgan, as a representative of REL, through Mr. Akhil Mittal, began discussions regarding a term sheet for the acquisition.

96.     On October 5, 2017, ISD (designated as the Investor), REL and Prime Securities Limited ("PSL") negotiated a document entitled "Expression of Interest Proposed Merger."  The Expression of Interest Proposed Merger contemplated a merger of REL and PSL to form a new entity.

97.     On October 7, 2017, JP Morgan presented the final financial disclosures for the transaction ("JP Morgan Reports").

98.     The JP Morgan Reports provided that RFL loans were collateralized, however the loans were not collateralized and the funds were actually being siphoned from the company by the Singh Brothers.

99.     The value of REL rested with RFL and that is what Loancore relied upon in entering the transaction.  However, the JP Morgan Reports were false and the RFL numbers in the reports were part of a ruse by Defendants to inflate the value of REL, RFL and Fortis Ltd..

100.    Based upon the representations in the JP Morgan Reports, on October 10, 2017, Loancore and RHC Holdings entered into a binding Heads of Agreement setting forth the terms for Loancore's takeover of management and control of REL.

101.    The "Preamble" of the Heads Agreement provided that ISD was negotiating binding agreements with SGGD and Bestest to take over the entire shareholding of SGGD for the assumption of debts and liabilities of SGGD and Bestest in order to gain control of approximately 22% of REL ("SGGD Transaction").

16

102.    The Heads Agreement stated that the purposes of the SGGD Transaction was to affect a change of control/management at REL in order to facilitate an investment by a "consortium of overseas investors" in REL, with Loancore exiting its holding in SGGD in favor of the overseas investors when they were brought in.

103.    The Heads Agreement also provided that RHC Holdings would cooperate with Loancore to "facilitate the transfer, sale or assignment of the Nonperforming Corporate Loan Book in the amount of approximately INR 2200 Crores from RFL by making the agreed to contributions as outlined [therein]."   Loancore committed to raise up to Euro 225 million from third party investors to meet the financial requirements of REL.

104.    On or about November 1 – 5, 2017, in furtherance of the SGGD Transaction, ISD, SGGD, Bestest and Dhillon, entered into a binding Letter of Intent whereby ISD agreed to invest an amount equal to redeem, repay and otherwise payoff the liabilities of SGGD, Bestest and Dhillon within 90 days of the execution of the Letter of Intent.  In return for the payment and satisfaction of the liabilities, ISD would receive from SGGD, Bestest and Dhillon title and interest in 31,244,279 shares of REL.

105.    On November 6, 2017, ISD assigned its rights and liabilities under the Letter of Intent to Loancore.

106.    Also on November 6, 2017, Loancore, SGGD and Bestest entered into an Undertaking and Agreement ("Undertaking and Agreement").

107.    The Undertaking and Agreement acknowledged that Loancore replaced ISD in the Letter of Intent.  Furthermore, the Undertaking and Agreement provided that "due to the diminution in value of the collateral/security underlying the liabilities of SGGD . . . . [i]n order to protect Loancore, SGGD is providing Loancore with an unconditional and irrevocable assured

indemnity in the amount of Indian Rupees Seventy Crores (Rs 70,00,00,000.00), to protect Loancore against all claims, losses, cost, damages, liability, or arising from any accident, injury or damage whatsoever associated with the [Letter of Intent]."

108.    On November 6, 2017, LVB reinstated the fixed deposits of RFL in the amount of approximately Rupees 750 Crores, which were the subject of the RFL Loan.

109.    On November 17, 2017, in furtherance of the Heads of Agreement, REL appointed Loancore's nominee Francis Lee to the Board of Directors of REL.

110.    Once Mr. Francis Lee was appointed to the Board of REL, it was determined that the representations by JP Morgan were grossly inadequate and misleading.

111.    Plaintiff discovered huge financial holes within REL and its substantial subsidiary RFL and an instance where LVB Bank, a private bank under operational control of the Reserve Bank of India had, substantially assisted the Singh Brothers in siphoning approximately $100 million from RFL.

112.    The new revelations which Mr. Lee uncovered included a) a fraudulent transaction with LVB and b) contra loans – where RFL made loans to third parties only for the purpose of routing funds to the Singh Brothers.

113.    Upon information and belief, the total amount of the new financial fraud uncovered by Mr. Lee was approximately $450 million.

114.    Furthermore, Mr. Lee learned of concealed liabilities such as statutory liabilities totaling approximate $75 million.

115.    In addition, Mr. Lee learned that RFL was in default of its loan covenants and the rating agencies had threatened to withdraw RFL's favorable rating.

4830-6474-5405, v. 9

116.     These discoveries by Mr. Lee should have all been known to and reported by JP Morgan as agent of REL.

117.     On November 20, 2017, Loancore and REL entered into a Penalty Fee Agreement ("Penalty Fee Agreement").

118.     The Penalty Fee Agreement was for a term of one (1) year.  It defined Loancore and REL's "Material Understandings" as the parties' "various discussions, agreements, arrangements, commitments and/or understanding whether oral or in writing . . . pertaining to the management of Religare."

119.     The Penalty Fee Agreement stated:

> A "Triggering Event" shall be deemed to have occurred at such time as any of the following events: in the event the Material Understandings are terminated by [REL] for any reason whatsoever, including the non-receipt of Board/Shareholder Approvals and/or in the event [REL] withdraws form the Material Understandings for any reason whatsoever.

120.     The Penalty Fee Agreement provided at Paragraph 4:

> **PENALTY:** At the end of the Term if there has been a Triggering Event then a) the Company shall pay the Vendor the sum of Indian Rupees One Hundred and Twenty-Five Crores (Rs. 1,25,00,00,000.00) Only within five (5) days of having received a Demand Notice from the Vendor or b) issue shares of the Company for an amount of Indian Rupees One Hundred and Twenty-Five Crores (Rs. 1,25,00,00,000.00) Only or any such amount representing Twenty-Four- and One-Half Percent (24.5%) of the fully diluted equity interest of Company (Shares). The obligation of the Company to issue and deliver any Shares in accordance [sic] the foregoing shall be subject to any necessary approval of stockholders or any stock exchange or regulatory authority having jurisdiction over the securities of the Company. If any Shares cannot be issued for whatever reason, the obligation of the Company to issue such Shares shall terminate and the Company shall be liable to pay the said amount only in cash.

121.    Loancore never paid off the liabilities of SGGD, Bestest and Dhillon as contemplated by the Letter of Intent because, within 90 days of the execution of the Letter of Intent, REL unlawfully transferred the shares pledged to Loancore to others.

122.    Upon information and belief, when Defendants learned of Mr. Lee's uncovering of their nefarious acts in connection with the Singh Brothers, Defendants conspired to conceal their involvement with the Singh Brothers and cutout Loancore.  In an effort to coverup their involvement with the Singh Brothers and feign ignorance, the Defendants commenced lawsuits against REL detailing fraud by the Singh Brothers in order to drive down the price of REL's stock.

123.    Defendants conspired to replace members of REL's Board and transfer ownership in REL.

124.    In spite of the Letter of Intent, on December 7, 2017 and December 14, 2017, in furtherance of the racketeering conspiracy, REL unlawfully transferred the shares in REL pledged to Loancore to IHF, Bay Capital and RIGF.

125.    Defendants IFC, NYLIM and Siguler, which at the time held substantial ownership of and had representatives who held Board of Directors positions at REL, orchestrated REL's illegal transfer of the shares to IHF, Bay Capital and RIGF in order to obfuscate their complicity in the Singh Brothers' scheme.

126.    Defendants IHF, Bay Capital and RIGF were shell entities utilized by REL to retain the shares.

127.    In furtherance of the conspiracy and enterprise, Defendants utilized the mail, phone calls and emails to and from the United States to give instructions to appoint members of Bay Capital, including Siddharth Mehta, to the Board of Directors.

128.    This was a conspiracy to takeover REL by IHF, Bay Capital and RIGF.  REL's transfer of the shares amounted to a breach of the Letter of Intent which constituted a "Triggering Event" under the Penalty Fee Agreement.

129.    On January 24, 2018, Defendants, in furtherance of the conspiracy with one another, agreed to grant an indemnity to the Singh Brothers for all loans owed by the Singh Brothers to REL.

130.    Defendants IFC, NYLIM and Siguler stepped away from the Board and procured the installation of Siddharth Mehta of Bay Capital and Sham Maheshwari of SSG as board members and forced the representative of Plaintiff's Predecessor to resign shortly thereafter.

131.    On February 10, 2018, REL issued a letter to Francis Lee terminating his employment at REL.  REL's termination of Mr. Lee violated Paragraph 4 of the Heads Agreement.

132.    On November 27, 2018, Loancore issued a demand notice to REL based upon the Penalty Fee Agreement, demanding payment of Rs. 1,250,000,000.00, the equivalent of approximately $16.5 million.

133.    On December 10, 2018, REL responded to Loancore's demand.  REL's response wrongfully denied the existence of the Penalty Fee Agreement and unlawfully contended that the demand was deficient under the law.

**III.    Religare Brand Scheme**

134.    Strategic is a 100% subsidiary of PFH.

135.    RHC Holdings, REL, RFL and Ranchem are associated companies.

136.    Elive is a "special purpose vehicle" organized by Plaintiff's Predecessors for the purpose of securing the 'Religare' brand/trademark ("the Brand") for the benefit of Strategic and PFH in connection with the transactions with the Religare Defendants.

21

137.    The Brand is a filed trademark in the United States Patent and Trademark Office.

138.    Strategic and PFH were in the business of buying and restructuring debts.

139.    Strategic and PFH entered into an agreement with REL whereby REL would transfer the Brand to Elive.  RHC, which owned all of the shares of Elive at the time of the transfer would transfer the shares of Elive to Strategic and PFH.  REL would then transfer the Brand to Strategic and PFH.

140.    On November 1, 2017, RHC assigned the Brand to Elive.

141.    Thereafter, the following took place:

a.    The Religare Defendants advised Strategic and PFH that RHC Holdings and Ranchem owed an unsecured debt of Rs 750 crores ("RHC/Ranchem Debt") to LVB.

b.    LVB demanded security for the RHC/Ranchem Debt.

c.    REL requested that Strategic and PFH agree to a structure whereby Elive would give security to LVB for the RHC/Ranchem Debt in the form of the Brand.

d.    In exchange for Strategic and PFH consenting to the use of the Brand (valued at approximately Rs 1100 crores) as security for the RHC/Ranchem Debt, LVB would agree to provide a loan to Plaintiff's Predecessors in the amount of Rs 350 crores.

e.    REL agreed with Strategic and PFH that REL would arrange for the funds to buy back the Brand from Elive for approximately Rs 1100 crores.

142.    On November 8, 2017, REL issued a letter to Elive confirming that REL would purchase the Brand from Elive for up to Rs 1100 crores, subject to an independent valuation.

143.    On November 9, 2017, Elive passed a resolution transferring RHC's shares to Strategic (5,000 shares) and PFH (5,000 shares).

144.    On November 9, 2017, Elive passed another resolution providing: i) a corporate guarantee in favor of LVB for a loan to RHC and Ranchem (i.e. RHC/Ranchem Debt) ; ii) a corporate guarantee in favor of LVB for a loan to Strategic and PFH; iii) a mortgage of the Brand in favor of LVB for the loan to RHC and Ranchem; iv) a mortgage of the Brand in favor of LVB for the loan to Strategic and PFH; and v) Elive would open an escrow account with LVB and any funds received for the sale of the Brand would be deposited in the escrow account, which LVB could use to apply toward the loans.

145.    On December 4, 2017, LVB issued a letter to PFH confirming a loan in the amount of Rs 150 crores.

146.    On December 4, 2017, LVB issued a letter to Strategic confirming a loan in the amount of Rs 200 crores.

147.    On December 8, 2017, PFH issued a letter to LVB requesting disbursement of the loan in the amount of Rs 150 crores.

148.    On December 8, 2017, Strategic issued a letter to LVB requesting disbursement of the loan in the amount of Rs 200 crores.

149.    On December 20, 2017, VGrow Advisors Private Limited issued a valuation report for the Brand.

150.    LVB never disbursed the loan funds in the amount of Rs 350 crores to PFH or Strategic.

151.    On February 14, 2018, the Singh Brothers stepped down from the Board of Directors of REL.

152.     On February 15, 2018, LVB issued letters cancelling the loans to PFH and Strategic without specifying a reason and citing to the general cancellation provision in the Clause No. 39 of the December 8, 2017 commitment letters.

153.   On February 22, 2018, an Indian Court entered an order maintaining the *status quo* and restraining LVB, RHC Holdings, REL, RFL and Ranchem from transferring and otherwise diluting the value of the Brand.

## IV.     <u>The Fortis Scheme</u>

154.     PFH is in the business of debt recovery and asset servicing.

155.     RHC Holdings, Fortis Ltd., Fortis Holdings, RHC Healthcare and SRL are related companies in connection with the brands **'Fortis'**, **'SRL'**, and **'La Femme'**.

156.     RHC Holdings was the sole owner of the trademark "Fortis."

157.     On October 7, 2015, RHC Holdings and Fortis Ltd. entered into a Brand License Agreement, whereby RHC Holdings granted a continued license to Fortis Ltd. to use the Fortis trademark.

158.     The October 7, 2015 Brand License Agreement provided that in addition to India, the Fortis trademark was registered in United Arab Emirates, Singapore, Qatar and Hong Kong.

159.     RHC Holdings was the sole owner of the trademark "SRL."

160.     On November 10, 2015, RHC Holdings and SRL entered into a Brand License Agreement, whereby RHC Holdings granted a continued license to SRL to use the SRL trademark.

161.     RHC Holdings was the owner of the trademark "La Femme."

162.     On or about June 14, 2017, RHC Holdings, as assignor, and RHC Healthcare, as assignee, entered into an Assignment Deed, whereby RHC Holdings assigned its rights to certain trademarks to RHC Healthcare, including certain Fortis and La Femme trademarks.

24

163.   In or about June 2017, IHH Berhad signed an exclusivity agreement for the purchase of Fortis Ltd. At all relevant times, Khazanah was the majority shareholder of IHH and directed the actions of IHH.

164.   On or about June 28, 2017, IHH Berhad pulled out of the deal because of concerns regarding a litigation which exposed REL to potentially 3,500 crore liability which froze the Singh Brothers' shares in various businesses.

165.   On or about August 31, 2017 – the Supreme Court of India restrained Singh Brothers from selling Fortis Ltd. shares and restrained lenders from selling pledged shares of Fortis.

166.   During August and September 2017, Walmark and Fortis Ltd. engaged in detailed discussions and negotiations to outline the structure of terms of a non-binding term sheet and to decide on the form, structure, value and viability of the transaction as per Indian laws.

167.   In or about September 2017, PFH and RHC Holdings began negotiating a deal to resolve differences between the parties.  The proposed terms provided that RHC Holdings would provide PFH with certain financial surety collateralized by brand agreements or licenses.

168.   On September 1, 2017, Walmark and PFH entered into a Transaction Facilitation & Support Services Agreement ("Facilitation Agreement") for PFH to serve as a facilitator for a transaction between Walmark and Fortis Ltd.

169.   Like Loancore, Walmark was a special purpose vehicle specifically established by the Ekahi Group for purposes of a transaction with Fortis Ltd. in order to fund the acquisition of shares of RHT.

170.   On or about September 11, 2017, based on a tele-conference between PFH, Walmark and Fortis Ltd. as a condition precedent, the parties agreed to use a common

25

"transactional counsel" and "advisers", the central purpose of which as communicated by Ms. Snigdha Khemka (Fortis Ltd.'s representative) was to expedite the matter. Accordingly, Walmark and PFH became fully reliant on advice so furnished to them by Standard Chartered and other concerns, who cited various regulatory oversight to devise a structure for the transaction.

171.    On September 26, 2017, Walmark entered into a non-binding term sheet with Fortis Ltd. ("NBTS").

172.    Defendant Bhavdeep Singh, the Chief Executive Officer of Fortis Ltd. signed the NBTS on behalf of Fortis Ltd.

173.    The NBTS provided for an approximately $600 million transaction whereby Walmark would receive shares in Fortis Ltd. up to 25% and additionally Walmark had the right to acquire the brand "Fortis" and all other related brands of Fortis Ltd.

174.    Immediately after executing the NBTS, Fortis Ltd. began insisting on immediate execution of a binding term sheet in order to receive the first tranche of funding.

175.    Walmark's due diligence in connection with the deal with Fortis Ltd. and RHC Holdings was limited to documents/records produced by Fortis Ltd. and its agent JP Morgan.

176.    Between September 12 and October 7, 2017, JP Morgan, as agent for Fortis Ltd., forwarded fraudulent reports to Walmark which Walmark relied upon in considering the transaction.

177.    The JP Morgan Reports provided that RFL loans were collateralized, however the loans were not collateralized and the funds were actually being siphoned from the company by the Singh Brothers.

178.    The value of REL rested with RFL and that is what Walmark relied upon in entering the transaction.  However, the JP Morgan Reports were false and the RFL numbers in the reports were part of a ruse by Defendants to inflate the value of REL, RFL and Fortis Ltd..

179.    On October 27, 2017, Mr. Shivinder Singh, Vice Chairman of Fortis Ltd., emailed Walmark introducing defendant Bhavdeep Singh to Walmark and PFH stating, "I'm taking the liberty to copy our CEO Mr. Bhavdeep Singh who would be critical to lead this process."

180.    In furtherance of the overall fraud, on November 14, 2017, Fortis Ltd. issued a press release that it executed a term sheet for the purchase of the entire portfolio of assets of RHT.  The press release gave the impression to the whole world that the deal would be finalized and a binding term sheet would be entered.

181.    In furtherance of the enterprise, Fortis Ltd. continued pushing toward a binding Term Sheet with Walmark. However, Walmark was reluctant as it had discovered underreporting of approximately $100 million of losses by Fortis Ltd.

181.    After much negotiation, Fortis Ltd. and Walmark changed the transaction structure on November 19, 2017 and Fortis Ltd. distributed a proposed final binding term sheet on November 28, 2017.

182.    From December 3 - December 6, 2017, representatives of Walmark and PFH attended meetings with representatives of Fortis Ltd. in India. During this time, the parties conducted extensive discussions spanning over several days to finalize the binding term sheet.

183.   On December 6, 2017, Walmark and Fortis Ltd. entered into a binding term sheet ("BTS"). Pursuant to the BTS, Fortis Ltd.  agreed to sell 108,333,333 equity shares to Walmark at a price of Rs. 180 per share.  Walmark also agreed to purchase INR 822 crores (Euro 110 million)

worth of Religare Health Trust bonds redeemable after 5 years. Bhavdeep Singh did not attend the meeting at which Walmark signed the BTS, but Walmark was assured he would sign the BTS.

184.    At the time of the signing of the BTS, two (2) Side Letters were also executed to implement the carefully designed commercial structure and understanding, which would have ensured the return of the funds siphoned by the Singh Brothers to Fortis Ltd. and also assured that Walmark would be paid a substantial breakup fee, in the event of a transaction failure.

185.    In December 2017, in order to facilitate the investment by Walmark and a financial exit by PFH, Walmark entered into a Side Letter with Fortis Ltd. and Fortis Holding ("December 2017 Side Letter").

186.    The December 2017 Side Letter provided that Walmark agreed to provide Fortis Ltd. with interim financing of Euro 90 million "against the pledged [sic] of the Brands associated with Fortis." It further provided, "This shall be repaid by the purchase of the Brand from the proceeds of the Investment."[3]

187.    The December 2017 Side Letter provided PFH entered into an acquisition of the "Brands" of Fortis Ltd. and that in lieu of payments to be made by PFH for Inter Corporate Deposits, PFH would contribute the Fortis Brands to Fortis Ltd.

188.    The Side Letter provided that "[PFH] is to receive the gross of differential settlement proceeds, i.e. Brand Value Accepted by [Fortis Ltd.] -  ICD Acquisition Consideration and [Walmark] agree[d] to use the proceeds of the financing as per [the December 6, 2017 Term Sheet] for this purpose."

189.    On December 6, 2017, Walmark and Fortis Ltd. entered into a second Side Letter.

---

[3] "Investment" is defined as the investment by Walmark into Fortis Ltd.

190.    The December 6, 2017 Side Letter acknowledged Walmark was induced to enter into the December 6, 2017 Term Sheet by covenants and agreements confirming "Brand Ownership by [PFH]" free and clear and not subject to any third-party liens or encumbrances.

191.    The December 6, 2017 Side Letter provided that Walmark shall be entitled to a Transaction Breakup Fee if the Seller failed to perform under the December 6 Term Sheet. Walmark shall be entitled to recover the Transaction Breakup Fee from PFH through the sale/disposition of the Brands to Fortis Ltd., and Walmark shall be granted a lien on the Brands with the right to affect a sale until the consummation of the transaction contemplated by the Term Sheet or the payment of the Transaction Breakup Fee.

192.    On or about December 29, 2017, defendant Bhavdeep Singh executed the BTS.

193.    On February 19, 2018, PFH's attorney submitted to Fortis Ltd. and TPG a demand for up to INR 900 Crores.  PFH's attorney asserted that the amount claimed was secured by the brands "Fortis," "SRL," and "La Femme."

194.    The BTS was binding and the only remaining issue was finalization of Fortis Ltd.'s balance sheet.

195.    Fortis Ltd. deliberately delayed finalizing the balance sheet so it could do a deal with TPG.

196.    RHC Holdings assigned to PFH the brands Fortis, SRL and La Femme.

197.    The Brands served as collateral and otherwise Walmark would not have engaged with Fortis Ltd. or RHC Holdings.

198.    Walmark was given a right over the Brands as surety to protect the breakup fees under the agreements and Fortis was bound to purchase the Brands.

199.    Against the backdrop of the takeover negotiations by Loancore and Walmark, Defendants separately and in concert were running a very public campaign against both REL and Fortis Ltd. and commenced numerous litigations alleging fraud. All of these acts had forced the share price of these entities to be depressed by at least 30%. With the share price depressed, Defendants consolidated their shareholding in REL and Fortis Ltd.

200.    The intention of Defendants was to drive the share price down so SSG could call a technical default on the loan which was securitized by the shares and prevent Loancore from asserting its rights.

201.    Defendants drove the Fortis Ltd. price down so that East Bridge was able to acquire it at a lower price.  Once East Bridge acquired its threshold percentage ownership, it illegally changed the deal with Walmark.

202.    In or about February 2018, the Singh Brothers resigned from the Boards of Fortis Ltd. and REL. The resignation was as a result of a notice sent by Defendants to change the Board. The resignation also followed a reconstitution of the Boards of Fortis Ltd. and REL.

203.    In 2018, in furtherance of the enterprise and conspiracy, defendants East Bridge Capital Master Fund Ltd., East Bridge Capital Master Fund I Ltd., the shareholders of Fortis, and National Westminster Bank Plc as Trustee of Jupiter India Fund (as represented by Jupiter Asset Management Limited) issued a requisition from East Bridge Capital Master Fund Ltd., and East Bridge Capital Master Fund I Ltd., and the shareholders of Fortis Ltd., for induction of Ms. Suvalaxmi Chakraborty, Defendant Ravi Rajagopal and Mr. Indrajit Banerjee as members of the Board and removal of Mr. Harpal Singh, Ms. Sabina Vaisoha, Dr. Brian William Tempest and Lt. Gen. Tejinder Singh Shergill from the directorship of the Fortis Ltd.

204.     The Board at its meeting held on April 26, 2018, decided to appoint the new board members on an immediate basis. Accordingly, Ms. Suvalaxmi Chakraborty, Defendant Ravi Rajagopal and Mr. Indrajit Banerjee were appointed as Additional Independent Directors w.e.f. April 27, 2018.

205.     On or about May 16, 2018, the Fortis Ltd.'s counsel denied the contents of various email exchanges between the parties reneging on the BTS and the Side Letters.

206.     On May 16, 2018, Walmark requested Fortis Ltd. bring the BTS before its Board for confirmation.

207.     To the shock of Walmark, on May 18, 2018, Fortis Ltd., while not denying the terms of the BTS, fabricated frivolous reasons to back out of the BTS and Side Letters claiming that Bhavdeep Singh never signed the BTS, although Fortis Ltd. provided Walmark with a copy of the BTS with Bhavdeep Singh's signature on or about December 29, 2020.

208.     Subsequently, Mr. Harpal Singh, Ms. Sabina Vaisoha and Lt. Gen. Tejinder Singh Shergill resigned from the directorship w.e.f. May 20, 2018 and the shareholders at its meeting held on May 22, 2018, and as provided in the Fortis Ltd. annual report, "regularized Ms. Suvalaxmi Chakraborty, Mr. Ravi Rajagopal and Mr. Indrajit Banerjee as directors of the Company and removed Dr. Brian William Tempest from directorship."

209.     With the illegal installation of the new Board initiated by East Bridge Capital Master Fund Ltd., and East Bridge Capital Master Fund I Ltd., including Ravi Rajagopal as Chairman, Fortis Ltd. wrongfully reneged on the BTS.

210.     Fortis Ltd. announced it would be seeking investments for the acquisition of assets of RHT by IHH Berhad, which violated the BTS.

211.    On October 11, 24 and 26, 2018, Walmark demanded that Fortis Ltd. pay the breakup fee of Rs 190 crores pursuant to the December 6, 2017 side letter.

212.    In advancement of the conspiracy, IHH Berhad, at the direction of Khazanah, ultimately purchased Fortis Ltd. at a depressed valuation.

213.    IHH Berhad's purchase of Fortis Ltd. violated the status quo order entered in Daiichi Sankyo Company Limited v. Malvinder Mohan Singh, which required all disclosed assets of the Singh Brothers to remain status quo, including the assets belonging to RHC Holdings.

## V.    TOTALITY OF THE SCHEMES

214.    The Religare Scheme (including the Religare Brand Scheme) and the Fortis Scheme were contrived by common owners, although they ran the schemes through different entities.

215.    IFC, NYLIM and Siguler, each of which raise extensive funds in the United States, each held interests and board positions at REL and Fortis Ltd., which were the vehicles for the overall scheme.

216.    Defendants knew that Plaintiff had been induced into entering into investment/acquisition agreements for REL and Fortis Ltd.

217.    In or about February of 2018, Defendants, congregated, conspired and/or otherwise collaborated to change the Board of both REL and Fortis Ltd. and have the criminal promoters, the Singh Brothers step down.

218.    The methods employed and the tactics deployed in the Religare Scheme and Fortis Scheme were starkly similar.

219.    In both the cases, the new investor, Defendants, of REL and Fortis Ltd. had either initiated sham litigations with these entities or had determined these entities unfit for investment.

Rather, the very public engagement of these new investor Defendants served to drive down the share price of both REL and Fortis Ltd.

220.    In the Religare Scheme the Defendants, including Siddharth Mehta and Sham Maheshwari, initiated litigations in order to drive down the share prices of REL.

221.    Defendant Siddarth Mehta formed a coalition with IFC, NYLIM, Siguler, SSG and Bay Capital in order to execute the Religare scheme.

222.    In the case of both REL and Fortis Ltd., after the optical change of management, the new investor Defendants went ahead and attempted to and did interfere with the binding agreements of Walmark and Loancore, and as part of this exercise, managed, manipulated and/or otherwise orchestrated the denial of the existence of these binding agreements.

223.    In each instance,  Defendants were fully aware that not only had Walmark and Loancore been fraudulently induced into the transactions with REL and Fortis Ltd., but at the request of Defendants, there was a deliberate attempt to use Walmark and Loancore for other fraudulent activity in order to cover-up the culpability of Defendants.

224.    In the case of REL, under the instructions of the new investor Defendants, duped Loancore into entering into a transaction with LVB Bank as set forth in Section III, above.

225.    Moreover, in the case of REL, Siddarth Mehta formed a coalition with IFC, NYLIM, Siguler, SSG and Bay Capital conspired to commence a malicious prosecution against Loancore in order to further obfuscate the rights of Loancore.

226.    Upon information and belief, the sham of Bay Capital's acquisition of interest in REL is only further highlighted by Bay Capital's failure to infuse the funds into REL.

227.    In the case of Fortis Ltd., Walmark was duped into a transaction to agree to pay for a balance sheet cleanup. These transactions did not materialize upon the discovery of the fraud by

Plaintiff's Predecessors, but, in each instance the transactions were structured to enable the new investor Defendants to avoid confirming the existence of that facts pertaining to the very obvious fund siphoning by the former promoters of REL and Fortis Ltd..

228.    In both the Religare Scheme and the Fortis Scheme, the new investor Defendants of REL and Fortis Ltd. publicly stated that they were aware of the financial malfeasance at both REL and Fortis Ltd. and in the case of REL, even went so far as to pursue remedies for oppression and mismanagement.

229.    In both instances, the new investor Defendants falsely and fraudulently claimed that they only discovered this fraud upon taking over management and control. Defendants, while proclaiming to be aggrieved and to be activists upon taking control continued, to and still continue to work with close affiliates and confidants of the Singh Brothers.

230.    The new investor Defendants had a clear understanding with the former promoters, the Singh Brothers, and when their own integrity was questioned, retaliated against Plaintiff's Predecessors.

231.    In the Religare Scheme and the Fortis Scheme, the new investor Defendants did conspire, combine, confederate and agree together to create impediments in the takeover of the brands of REL and Fortis Ltd. by Walmark and Loancore

232.    It was Plaintiff's Predecessors that had forced REL and Fortis Ltd. to disclose the frauds during the due diligence.

233.    It was Plaintiff who refused to renegotiate leases with the Singh Brothers at twice the market rent.

234.    REL and Fortis Ltd. and the Singh Brothers were one economic unit and on account of the method or modality of the illegal takeover of these enterprises, the new investor Defendants

34

have both successor and alter ego liability. The transactions are nothing but deemed mergers and for which the liability of these entities must be applied to those in control of the management and affairs.

## **FIRST COUNT**
**(Federal Racketeering Influenced and Corrupt Organizations ("RICO") Act § 1962(c))**

235.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

236.    18 U.S.C. § 1962(c) defines the activities prohibited under RICO, in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

237.    Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari acted collectively as an enterprise and each conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs.

238.    The activity of the enterprise or the predicate acts of the racketeering affect interstate commerce and foreign commerce.

239.    Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff's Predecessors.

35

240.    Pursuant to and in furtherance of their schemes to defraud Plaintiff, Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari committed multiple related acts of wire fraud and mail fraud.

241.    The pattern of racketeering activity in which Defendants engaged and conspired to engage were predicate acts in violation of 18 U.S.C. § 1961(1)(B): § 1341 (mail fraud); § 1343 (wire fraud); § 1346 (honest services fraud); § 1956 (money laundering) and aided and abetted in fraud in the sale of securities.

242.    Defendants knowingly used the interstate mails and the wires to further that scheme with the intent to defraud, including, but not limited to, the following acts:

a.    East Bridge used the email and wires to move for an extraordinary general meeting to change the board.

b.    East Bridge used the mail and wires to give instructions to appoint their representatives.

c.    East Bridge used the mail and wires to give instructions to reject the Walmart transaction.

d.    East Bridge used the mail and wires to give instructions to accept the offer of IHH.

e.    IFC used the mail and wires to give instructions to appoint the members of Bay Capital to the board.

f.    IFC used the mail and wires to reject the Loancore transaction.

g.    Defendants used the mail and wires to initiate and instruct sham litigations.

36

h.      Defendants used the mail and wires in furtherance of the formation and association among the defendants, including the association between and among IFC, NYLIM, Siguler, SSG and Bay Capital.

i.      Defendants used the mail and wires in furtherance of creating documentation to hinder the Plaintiff's rights to the Religare, Fortis, SRL and La Femme brands.

j.      Defendants used the mail and wires to commence and advance a malicious prosecution against Loancore in order to further obfuscate the rights of Loancore.

k.      Defendants used the mail and wires to baselessly and illegally reject the claims of Walmark and Loancore.

l.      Bhavdeep Singh, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari used the mail and wires as fiduciaries of REL and Fortis Ltd. to further the fraudulent schemes.

m.      Defendants used the mail and wires to conduct financial transactions which involved the proceeds of the Singh Brothers' unlawful activity, effectively laundering the Singh Brothers' money.

243.    Defendants pursued their schemes through material misrepresentations or material omissions and nondisclosures relating to REL and Fortis Ltd.

244.    Both of the Defendants' schemes aided and abetted the Singh Brothers' fraud in the sale of securities, for which the Singh Brothers have been criminally convicted.

245.    While the Defendants purportedly conduct legitimate businesses, the predicate acts were the regular way the Defendants operated their businesses.

246.    There remains a threat of continued criminal activity by the Defendants in schemes patterned after the REL and Fortis Ltd. schemes and the continued execution of the REL and Fortis Ltd. schemes.

247.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C.A. § 1961(5) inasmuch as in both the REL scheme and Fortis Ltd. scheme the following occurred: Plaintiff's Predecessors discovered and refused to be complicit in criminal activity, i.e. the Singh Brothers' financial crimes; the Defendants replaced board members at both REL and Fortis; Defendants drove down stock prices through sham lawsuits and negative media reports; the new boards populated by associates of the Defendants reneged on the agreements with the Plaintiff's Predecessors; and Defendants and their affiliates invested in the companies at a reduced price .

248.     Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C.A. § 1962(c).

249.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C.A. § 1962(c), Plaintiff has been injured in its business and property in that it suffered business losses and losses of intangible assets.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari, jointly and severally, as follows:

A.     Enjoining Defendants from alienating or otherwise transferring any shares they hold in REL and/or Fortis Ltd.;

B.     Enjoining Defendants from selling any assets of REL and/or Fortis Ltd.

C.     Awarding treble, actual and compensatory damages;

4830-6474-5405, v. 9

D.      Awarding punitive damages;

E.      Awarding pre and post judgment interest;

F.      Awarding counsel fees, expenses and costs; and

G.      Awarding such other relief as equitable and appropriate under the circumstances.

## SECOND COUNT
### (Federal RICO § 1962(d))

250.    Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth at length herein.

251.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C.A. § 1962 (c). Specifically, Defendants conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

252.    Defendants have intentionally conspired and agreed to directly and indirectly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

253.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

254.    That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C.A. § 1962(d).

255.    As direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C.A. § 1962(d), Plaintiff has been injured in its business and property in that it suffered business losses and losses of intangible assets.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler,

Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari jointly and severally as follows:

A.      Enjoining Defendants from alienating or otherwise transferring any shares they hold in REL and/or Fortis Ltd.;

B.      Enjoining Defendants from selling any assets of REL and/or Fortis Ltd.

C.      Awarding treble, actual and compensatory damages;

D.      Awarding punitive damages;

E.      Awarding pre and post judgment interest;

F.      Awarding counsel fees, expenses and costs; and

G.      Awarding such other relief as equitable and appropriate under the circumstances.

### THIRD COUNT
### (Breach of Contract – Penalty Fee Agreement)

256.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

257.    On November 20, 2017, for valid consideration Loancore and REL entered into the Penalty Fee Agreement.

258.    The Penalty Fee Agreement was for a term of one (1) year.  It defined Loancore and REL's "Material Understandings" as the parties' "various discussions, agreements, arrangements, commitments and/or understanding whether oral or in writing . . . pertaining to the management of Religare."

259.    The Penalty Fee Agreement stated:

A "Triggering Event" shall be deemed to have occurred at such time as any of the following events: in the event the Material Understandings are terminated by [REL] for any reason whatsoever, including the non-receipt of Board/Shareholder Approvals and/or in

the event [REL] withdraws form the Material Understandings for any reason whatsoever.

260.    The Penalty Fee Agreement provided at Paragraph 4:

**PENALTY:** At the end of the Term if there has been a Triggering Event then a) the Company shall pay the Vendor the sum of Indian Rupees One Hundred and Twenty-Five Crores (Rs. 1,25,00,00,000.00) Only within five (5) days of having received a Demand Notice from the Vendor or b) issue shares of the Company for an amount of Indian Rupees One Hundred and Twenty-Five Crores (Rs. 1,25,00,00,000.00) Only or any such amount representing Twenty-Four- and One-Half Percent (24.5%) of the fully diluted equity interest of Company (Shares). The obligation of the Company to issue and deliver any Shares in accordance [sic] the foregoing shall be subject to any necessary approval of stockholders or any stock exchange or regulatory authority having jurisdiction over the securities of the Company. If any Shares cannot be issued for whatever reason, the obligation of the Company to issue such Shares shall terminate and the Company shall be liable to pay the said amount only in cash.

261.    The Letter of Intent provided Loancore was to receive 31,244,279 shares of REL in exchange for Loancore paying off the liabilities SGGD, Bestest and Dhillon.

262.    In spite of the Letter of Intent, on December 7, 2017 and December 14, 2017, REL unlawfully transferred the shares in REL pledged to Loancore to IHF, Bay Capital and RIGF.

263.    REL's transfer of the shares terminated a Material Understanding with Loancore and constituted a "Triggering Event" under the Penalty Fee Agreement, entitling Loancore to collect the Penalty set forth in the Penalty Fee Agreement.

264.    On November 27, 2018, Loancore issued a demand notice to REL based upon the Penalty Fee Agreement, demanding payment of Rs. 1,250,000,000.00, the equivalent of approximately $16.5 million.

265.    On December 10, 2018, REL responded to Loancore's demand.  REL's response wrongfully denied the existence of the Penalty Fee Agreement and unlawfully contended that the demand was deficient under the law.

266.    Plaintiff acquired all rights and remedies of Loancore under the Penalty Fee Agreement.

267.    The actions of REL constitute a breach of the terms of the Penalty Fee Agreement.

268.    Loancore sustained damages as a result of REL's breach of the Penalty Fee Agreement.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant Religare Enterprises Limited, as follows:

A.      Enjoining REL from selling any assets of REL;

B.      Awarding compensatory damages;

C.      Awarding punitive damages;

D.      Awarding pre and post judgment interest;

E.      Awarding counsel fees, expenses and costs; and

F.      Awarding such other relief as equitable and appropriate under the circumstances.

### FOURTH COUNT
### (Breach of Implied Covenant of Good Faith and Fair Dealing – Penalty Fee Agreement)

269.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

270.    Every contract imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.

271.    REL has acted in bad faith by not giving equal consideration to the interests of Loancore as they have their own interests.

42

272.    REL wrongfully and intentionally breached the duty of good faith and fair dealing by denying Loancore the benefits to which it is entitled under the Penalty Fee Agreement.

273.    The breaches of the covenant of good faith and fair dealing by REL has proximately and directly caused damages to Loancore.

274.    Plaintiff acquired all rights and remedies of Loancore under the Heads of Agreement.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant, Religare Enterprises Limited, as follows:

A.    Enjoining REL from selling any assets of REL;

B.    Awarding compensatory damages;

C.    Awarding punitive damages;

D.    Awarding pre and post judgment interest;

E.    Awarding counsel fees, expenses and costs; and

F.    Awarding such other relief as equitable and appropriate under the circumstances.

## FIFTH COUNT
### (Breach of Contract – BTS and Side Letters)

275.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

276.    On December 6, 2017, for valid consideration Walmark and Fortis Ltd. entered into the BTS.  Pursuant to the BTS, Fortis Ltd. agreed to sell 108,333,333 equity shares to Walmark at a price of Rs. 180 per share.  Walmark also agreed to purchase INR 822 crores (Euro 110 million) worth of Religare Health Trust bonds redeemable after 5 years.

277.    At the time of the signing of the BTS, two (2) Side Letters were also executed.

278.    In December 2017, Walmark entered into a Side Letter with Fortis Ltd. and Fortis Holding.

279.    The December 2017 Side Letter provided that Walmark agreed to provide Fortis Ltd. with interim financing of Euro 90 million "against the pledged [sic] of the Brands associated with Fortis." It further provided, "This shall be repaid by the purchase of the Brand from the proceeds of the Investment."

280.    The December 2017 Side Letter provided PFH entered into an acquisition of the "Brands" of Fortis Ltd. and that in lieu of payments to be made by PFH for Inter Corporate Deposits, PFH would contribute the Fortis Brands to Fortis Ltd.

281.    The Side Letter provided that "[PFH] is to receive the gross of differential settlement proceeds, i.e. Brand Value Accepted by [Fortis Ltd.] - ICD Acquisition Consideration and [Walmark] agree[d] to use the proceeds of the financing as per [the December 6, 2017 Term Sheet] for this purpose."

282.    On December 6, 2017, Walmark and Fortis Ltd. entered into a second Side Letter.

283.    The December 6, 2017 Side Letter acknowledged Walmark was induced to enter into the December 6, 2017 Term Sheet by covenants and agreements confirming "Brand Ownership by [PFH]" free and clear and not subject to any third-party liens or encumbrances.

284.    The December 6, 2017 Side Letter provided that Walmark shall be entitled to a Transaction Breakup Fee if the Seller failed to perform under the BTS. Walmark shall be entitled to recover the Transaction Breakup Fee from Fortis Ltd.

285.    The BTS was binding and the only remaining issue was finalization of Fortis Ltd.'s balance sheet.

4830-6474-5405, v. 9

286.    Fortis Ltd. deliberately delayed finalizing the balance sheet so it could do a deal with TPG.

287.    Walmark was given a right over the Brands as surety to protect the breakup fee under the agreements and Fortis was bound to purchase the Brands.

288.    On or about May 16, 2018, the Fortis Ltd.'s counsel denied the contents of various email exchanges between the parties reneging on the BTS and the Side Letters.

289.    On May 16, 2018, Walmark requested Fortis Ltd. bring the BTS before its Board for confirmation.

290.    To the shock of Walmark, on May 18, 2018, Fortis Ltd., while not denying the terms of the BTS, fabricated frivolous reasons to back out of the BTS and Side Letters, claiming that Bhavdeep Singh never signed the BTS, although Fortis Ltd. provided Walmark with a copy of the BTS with Bhavdeep Singh's signature on or about December 29, 2020.

291.    Fortis Ltd. failed and refused to pay the Transaction Breakup Fee.

292.    Plaintiff acquired all rights and remedies of Walmark under the BTS and Side Letters.

293.    The actions of REL constitute a breach of the terms of the BTS and Side Letters.

294.    Walmark sustained damages as a result of Fortis Ltd.'s breach of the BTS and Side Letters.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant Fortis Ltd. as follows:

A.      Enjoining Fortis Ltd. from selling any assets of Fortis Ltd.;

B.      Awarding compensatory damages;

C.      Awarding punitive damages;

4830-6474-5405, v. 9

D.      Awarding pre and post judgment interest;

E.      Awarding counsel fees, expenses and costs; and

F.      Awarding such other relief as equitable and appropriate under the circumstances.

### SIXTH COUNT
### (Breach of Implied Covenant of Good Faith and Fair Dealing – BTS and Side Letters)

295.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

296.    Every contract imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.

297.    Fortis Ltd. has acted in bad faith by not giving equal consideration to the interests of Walmark as they have their own interests.

298.    Fortis Ltd. wrongfully and intentionally breached the duty of good faith and fair dealing by denying Walmark the benefits to which it is entitled under the BTS and Side Letters.

299.    The breaches of the covenant of good faith and fair dealing by Fortis Ltd. has proximately and directly caused damages to Walmark.

300.    Plaintiff acquired all rights and remedies of Walmark under the BTS and Side Letters.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant Fortis Ltd. as follows:

A.      Enjoining Fortis Ltd. from selling any assets of Fortis Ltd.;

B.      Awarding compensatory damages;

C.      Awarding punitive damages;

D.      Awarding pre and post judgment interest;

E.      Awarding counsel fees, expenses and costs; and

46

F.     Awarding such other relief as equitable and appropriate under the circumstances.

## SEVENTH COUNT
### (Breach of Implied Covenant of Good Faith and Fair Dealing – Heads of Agreement)

301.   Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

302.   On October 10, 2017, for valid consideration, Loancore and RHC Holdings entered into a binding Heads of Agreement setting forth the terms for Loancore's takeover of management and control of REL.

303.   The Heads of Agreement provided RHC Holdings "shall cause the appointment of a Loancore Designee to the Board of [REL].  RHC acknowledges that the said appointment is a critical condition precedent to advance the Purpose of this Agreement…"

304.   On November 17, 2017, in furtherance of the Heads of Agreement, REL appointed Loancore's nominee Francis Lee to the Board of Directors of REL.

305.   Mr. Lee discovered huge financial holes within REL and its subsidiary RFL, and an instance where LVB Bank, a private bank under operational control of the Reserve Bank of India, had substantially assisted the Singh Brothers in siphoning approximately $100 million from RFL.

306.   These new revelations which Mr. Lee uncovered included a) a fraudulent transaction with LVB and b) contra loans – where RFL made loans to third parties only for the purpose of routing funds to the Singh Brothers.

307.   Upon information and belief, the total amount of the new financial fraud uncovered by Mr. Lee was approximately $450 million.

308.   Furthermore, Mr. Lee learned of concealed liabilities such as statutory liabilities totaling approximate $75 million.

4830-6474-5405, v. 9

309.    In addition, Mr. Lee learned that RFL was in default of its loan covenants and the rating agencies had threatened to withdraw RFL's favorable rating.

310.    On February 10, 2018, less than 3 months after his appointment, RHC Holdings issued a letter to Mr. Lee terminating him as a member of the Board of Directors at REL as part of its scheme to coverup its past dealings.

311.    Every contract imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.

312.    RHC Holdings has acted in bad faith by not giving equal consideration to the interests of Loancore as they have their own interests.

313.    RHC Holdings wrongfully and intentionally breached the duty of good faith and fair dealing by denying Loancore the benefits to which they are entitled under the Heads of Agreement.

314.    The breaches of the covenant of good faith and fair dealing by RHC Holdings has proximately and directly caused damages to Loancore.

315.    Plaintiff acquired all rights and remedies of Loancore under the Heads of Agreement.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant, RHC Holdings, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding pre and post judgment interest;

D.    Awarding counsel fees, expenses and costs; and

E.    Awarding such other relief as equitable and appropriate under the circumstances.

48

## EIGHTH COUNT
### (Fraud in the Inducement – Heads of Agreement)

316.     Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

317.     REL made a material representation of a presently existing or past fact to Loancore prior to the parties entering into the Heads of Agreement.  REL presented the JP Morgan Reports which falsely stated that RFL loans were collateralized, however the loans were not collateralized and the funds were actually being siphoned from the company by the Singh Brothers.

318.     REL     made the     representation     in     the     JP     Morgan     Reports with knowledge of their falsity.

319.     REL intended that Loancore rely thereon.

320.     Loancore relied upon the representations to its detriment, and such reliance was reasonable.

321.     Plaintiff acquired all rights and remedies of Loancore under the Heads of Agreement.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant Religare Enterprises Limited, as follows:

A.     Enjoining REL from selling any assets of REL;

B.     Awarding compensatory damages;

C.     Awarding punitive damages;

D.     Awarding pre and post judgment interest;

E.     Awarding counsel fees, expenses and costs; and

F.     Awarding such other relief as equitable and appropriate under the circumstances.

## NINTH COUNT

49

**(Tortious Interference with Contract - Penalty Fee Agreement)**

322.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

323.    Loancore and REL entered into the Penalty Fee Agreement.

324.    Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, and RHT intentionally interfered with the Penalty Fee Agreement with malice.

325.    As a result of said interference Loancore lost the benefits of the Penalty Fee Agreement and suffered damages.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants Bhavdeep Singh, Fortis Ltd., East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari, jointly and severally, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding pre and post judgment interest;

D.    Awarding counsel fees, expenses and costs; and

E.    Awarding such other relief as equitable and appropriate under the circumstances.

**TENNTH COUNT**
**(Tortious Interference with Contract – BTS and Side Letters)**

326.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

50

327. Walmark and Fortis Ltd. entered into the BTS and Side Letters.

328. East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, and RHT intentionally interfered with the BTS and Side Letters with malice.

329. As a result of said interference Walmark lost the benefits of the BTS and Side Letters and suffered damages.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants East Bridge, Fortis Holdings, IHH Berhad, Khazanah, NTVP, RHC Holdings, RHC Healthcare, SRL, REL, RFL, LVB, Ranchem, NYLIM, IFC, Siguler, Bay Capital, SSG, IHF, RIGF, RHT, Ravi Rajagopal, Siddarth Mehta and Sham Maheshwari, jointly and severally, as follows:

A. Awarding compensatory damages;

B. Awarding punitive damages;

C. Awarding pre and post judgment interest;

D. Awarding counsel fees, expenses and costs; and

E. Awarding such other relief as equitable and appropriate under the circumstances.

### ELEVENTH COUNT
### (Declaratory Judgment - Brand Ownership - Fortis)

330. Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

331. By Deed of Assignment dated February 18, 2019, PFH assigned all rights, title and interest in the brands of Fortis Ltd., "including but not limited to 'Fortis' 'La Femme' and 'SRL'" to Walmark.

332. Plaintiff acquired all rights and remedies of Walmark.

**WHEREFORE,** Plaintiff respectfully request that the Court enter judgment as follows:

A.      Declaring Plaintiff holds all rights, title and interest in the brands of Fortis Ltd., "including but not limited to 'Fortis' 'La Femme' and 'SRL;'"

B.      Awarding compensatory damages including, but not limited to, payment of a reasonable royalty;

C.      Awarding punitive damages;

D.      Awarding pre and post judgment interest;

E.      Awarding counsel fees, expenses and costs; and

F.      Awarding such other relief as equitable and appropriate under the circumstances.

## TWELFTH COUNT
### (Declaratory Judgment – Brand Ownership - Religare)

333.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

334.    By Deed of Assignment dated February 18, 2019, Strategic and PFH assigned all rights, title and interest in the brands of Religare to Loancore.

335.    Plaintiff acquired all rights and remedies of Loancore.

**WHEREFORE,** Plaintiff respectfully request that the Court enter judgment as follows:

A.      Declaring Plaintiff holds all rights, title and interest in the brands of Religare;

B.      Awarding compensatory damages including, but not limited to, payment of a reasonable royalty;

C.      Awarding punitive damages;

D.      Awarding pre and post judgment interest;

E.      Awarding counsel fees, expenses and costs; and

F.      Awarding such other relief as equitable and appropriate under the circumstances.

4830-6474-5405, v. 9

### THIRTEENTH COUNT
### (Conspiracy)

336.    Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein.

337.    Defendants participated in a confederation with a common design for an unlawful purpose.

338.    Plaintiff sustained special damages as a result of Defendants.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    Enjoining Defendants from alienating or otherwise transferring any shares they hold in REL and/or Fortis Ltd.;

B.    Enjoining Defendants from selling any assets of REL and/or Fortis Ltd.

C.    Awarding treble, actual and compensatory damages;

D.    Awarding punitive damages;

E.    Awarding pre and post judgment interest;

F.    Awarding counsel fees, expenses and costs; and

G.    Awarding such other relief as equitable and appropriate under the circumstances.


**MANDELBAUM SALSBURG P.C.**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
973.736.4600
973.325.7467
lweiner@lawfirm.ms
*Attorneys for Plaintiff*

Dated: June 16, 2020          By:    */s/     Lawrence C. Weiner*
                                     LAWRENCE C. WEINER