Alfred V Gellene, Esq.
41 Vreeland Avenue
Suite 33
Totowa, NJ 07512
Bar No. 003091979
Ph.:  973-837-8002
Fax: 973-425-5244
algellene@gmail.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

EMQORE ENVESECURE PRIVATE CAPITAL TRUST,

Plaintiff,

v.

BHAVDEEP SINGH;
MALVINDER MOHAN SINGH;
SHIVINDER MOHAN SINGH;
SHAKEEB ALAM;
FORTIS HEALTHCARE LIMITED;
EAST BRIDGE CAPITAL MASTER FUND LTD.;
EAST BRIDGE CAPITAL MASTER FUND I LTD.;
EAST BRIDGE CAPITAL MANAGEMENT LP;
IHH HEALTHCARE BERHAD;
KHAZANAH NASIONAL BERHAD;
RELIGARE ENTERPRISES LIMITED;
RELIGARE FINVEST LIMITED;
RELIGARE ENTERPRISES LTD
CARE HEALTH INSURANCE LIMITED;
RELIGARE BROKING LIMITED;
DBS BANK;
SRL LIMITED
NEW YORK LIFE INVESTMENT MANAGEMENT, LLC;
INTERNATIONAL FINANCE CORPORATION;
SIGULER GUFF & COMPANY, LP.;
BAY CAPITAL ADVISORS PRIVATE LIMITED;
ARES MANAGEMENT CORPORATION;
MITSUI & CO. LTD.
MITSUI & CO (USA) INC.;
ARES MANAGEMENT CORPORATION

Civil Action No.: 2:20-cv-07324-KM-JBC

Hon. Kevin McNulty, U.S.D.J.
Hon. James B. Clark, U.S.M.J

**FIRST AMENDED COMPLAINT**

1

ARES SSG;
SIDDHARTH DINESH MEHTA;
SHAM MAHESHWARI;
ABC CORP. (1 – 10) (fictitious entities), and
JOHN AND JANE DOES 1-10 (fictitious entities)

Defendants.

FORTIS HEALTHCARE HOLDINGS LIMITED;
NORTHERN TK VENTURE PTE. LTD.;
BESTEST DEVELOPERS PRIVATE LIMITED;
RELIGARE HEALTH TRUST;
SGGD PROJECTS DEVELOPMENT PRIVATE LIMITED;
DAIICHI SANKYO, INC.
RANCHEM PRIVATE LIMITED;
RASHMI SALUJA
RAVI RAJAGOPAL;
SECURITIES EXCHANGE BOARD OF INDIA
RESERVE BANK OF INDIA
STATE BANK OF INDIA
INDIA HORIZONS FUND LIMITED;
RESILIENT INDIA GROWTH FUND;
RHC HOLDINGS PRIVATE LIMITED;
RELIGARE HEALTH TRUST;
M.V. DOSHI
LKP FINANCE LTD.
SS KOTHARI MEHTA & COMPANY and
IDBI TRUSTEESHIP SERVICES LIMITED
GURINDER SINGH DHILLON

Non-Party Defendants

Plaintiff Emqore Envesecure Private Capital Trust ("Plaintiff" or "Emqore"), by way of

Complaint against Defendants states, as follows:

## OVERVIEW

1. This is a complex civil action for RICO remedies authorized by the federal statutes at

18 U.S.C. 1961 et seq.; for declaratory and injunctive relief; for actual, consequential and

exemplary damages; and for all other relief which are just and proper under all circumstances which have occasioned this AMENDED COMPLAINT. See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO"). Over the course of several years, the Defendants have tortiously interfered with and injured the Plaintiff by means of a plan which was conceived and substantially executed in the United States. These Defendants are collectively referred to as the "RICO Members" or the "RICO Defendants" or "RICO Enterprise" members.

2.  The enterprise's aim was to put enough pressure on the Plaintiff and have inflicted maximum damage to the Plaintiff's reputation and personal psychological pressure on the Plaintiff's top executives, to disrupt Plaintiff's business, relations and prospects and thereby force the Plaintiff into abandoning its claims against the Defendants. To pressure the Plaintiff, the RICO Defendants have fabricated litigation, trumped-up criminal charges and also made false statements to courts in an attempt to cover up their wrongdoing and to obstruct Plaintiff's recovery efforts.

3.  The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq.*, with predicate acts of mail and wire fraud, money laundering, criminal copyright (trademark) infringement, obstruction of justice, and witness tampering, among others, tortious interference with contract, obstruction of criminal investigations, obstruction of local law enforcement, peonage and slavery. In addition, Defendants' conduct constitutes common law fraud, unjust enrichment, intentional interference with contract, trespass to chattels, and civil conspiracy, among others.

4.  Other RICO predicate acts, although appearing to be isolated events, were actually part of the overall conspiracy and pattern of racketeering activity alleged herein, e.g. mail fraud and bank fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

## PARTIES

### PLAINTIFF

5.   Plaintiff Emqore Envesecure Private Capital Trust[1] is trust settled under the laws of Wyoming with a principal place of business at 1712 Pioneer Avenue, Suite 387, Cheyenne, Wyoming 82001.   By an Assignment dated January 22, 2020, Loancore Servicing Solutions Private Limited, Walmark Health Private Limited, Loancore Limited, Walmark Holdings Limited, Emqore EU and Stratgala AG, hereinafter referred to as the Predeccessor Companies, assigned all right, title and interest in any and all claims against the defendants herein to Plaintiff.

### RICO DEFENDANTS

6.   The defendants listed in paragraphs 7 through 29   are the individuals who have conspired to engage in a pattern of racketeering activity, have each committed numerous criminal

---

[1] By Assignment Deed, plaintiff Emqore acquired all rights, title and interest  of Loancore Servicing Solutions Private Limited, Loancore Limited, Walmark Health Private Limited, Walmark Holdings Limited, Stratgala AG and Emqore OU in the contracts, agreements, arrangements, understandings, and commitments relating to the following: brands of Religare; rights in the shareholding of Elive Infotech Private Limited ("Elive"); funding from LVB Bank ("LVB"); proceeds of any put option or purchase option provided by Religare Enterprises Limited ("REL"); proceeding, actions or remedies against REL or Religare Finvest Limited ("RFL") pertaining to the brands or LVB pertaining to any funding commitments; and beneficial interest in any penalty fee agreement or other assurances provided by REL. Strategic Credit Capital Pvt. Ltd. ("Strategic") is an Indian company with a business address at A49 Mohan Cooperative Industrial Area, New Delhi 110044. Participation Finance & Holdings (India) ("PFH") is an Indian company with business addresses at Number 1 Subhash Nagar, Dehradun, Uttranchal 248002 and A49 Mohan Cooperative Industrial Area, New Delhi 110044. On February 18, 2019, Strategic and PFH assigned their rights, title, and interest to Loancore Servicing Solutions Private Limited for contracts, agreements, arrangements of understandings relating to the following: the brands of Religare; any rights in the shareholding of Elive Infotech Private Limited; funding from LVB; proceeds of any put options or purchase option provided by Religare Enterprises Limited for the acquisition of the brands; proceeding, actions or remedies against Religare Enterprises Limited pertaining to the brands or LVB Bank pertaining to funding commitments. On February 18, 2019, PFH assigned all rights, title and interest to Walmark Health Private Limited for contracts, agreements, arrangements or understandings relating to the following: the brands of Fortis Healthcare Limited, including but not limited to "Fortis" La Femme" and "SRL"; costs, fees, causes of action or claims against Fortis Healthcare Limited and Fortis Healthcare Holdings Limited; proceeds of any put options or purchase option provided by Fortis Healthcare Limited and Fortis Healthcare Holdings Limited; proceeding, actions or remedies against Fortis Healthcare Limited and Fortis Healthcare Holdings Limited or RHC Healthcare Management Private Limited.

acts as part of their scheme to defraud and extort the Plaintiff, and have each participated in the operation or management of the criminal enterprise.

7.  Defendant Malvinder Mohan Singh and Defendant Shivinder Mohan Singh (the "Singh Brothers" or "Brothers Singh") inherited one of India's largest pharmaceutical companies, Ranbaxy Limited ("Ranbaxy"). Ranbaxy acquired Ohm Laboratories, Inc, of 14 Terminal Rd, New Brunswick, NJ 08901, USA in 1995 through, it is believed, Ranbaxy (USA) Inc. or Ranbaxy Inc. subsidiaries of Ranbaxy. Ranbaxy (USA) Inc ("Ranbaxy USA"). It is believed that Ranbaxy USA operated through New Jersey and currently resides at 600 College Road East Suite 2100 Princeton, NJ 08540 United States. Ranbaxy USA became the primary selling agent for Ranbaxy, it through which entity the Singh Brothers, flooded with the United States market with generic drugs. It is because of which entity, that Daiichi Sankyo decided to acquire Ranbaxy, that is in order to gain access to the United States generic market. And it is on account Ranbaxy USA, right in the heart of New Jersey, that the Singh Brothers, falsified material data and records, in order to induce Daiichi Sankyo to acquire Ranbaxy.  In the largest drug safety settlement to date, on May 13, 2013, Ranbaxy USA, pleaded guilty to felony charges relating to the manufacture and distribution of certain adulterated drugs made at two of Ranbaxy's manufacturing facilities in India under which Ranbaxy also agreed to pay a criminal fine and forfeiture totaling $150 million and to settle civil claims under the False Claims Act and related State laws for $350 million.  In addition to being fraudsters, the Singh Brothers, as more fully detailed below, are also high-ranking members of the religious cult Radha Soami Satsang Beas, which they themselves publicly claim was funded and grown from the proceeds of Ranbaxy USA crime(s). Malvinder Mohan Singh is at Number 26, Maulsari Avenue, Westend Greens, Rajokari, New Delhi and Shivinder Mohan Singh at Number 10, Maulsari Avenue Westend Greens, Rajokari, New Delhi.

8. Defendant Bhavdeep Singh is an individual with an address of 56 Walsh Dr., Mahwah, New Jersey and at all relevant times herein was Chief Executive Officer of Defendant Fortis Health Care Limited. as he described himself, a close confidant of the Singh Brother and is primarily responsible for putting together the scheme which helped siphon funds from the entities controlled by the Singh Brothers. Bhavdeep Singh is an individual residing in New Jersey, with an intention to reside there indefinitely, and is therefore a citizen of New Jersey.

9. Defendant New York Life Investment Management, LLC ("NYLIM") is a limited liability company with a business address at 30 Hudson Street, Jersey City, New Jersey. Defendant NYLIM owned approximately 7% of Defendant Religare Finvest Limited, hereinafter referred to as "RFL", through NYLIM Jacob Ballas India Fund III LLC and maintained board representation in RFL. Upon information and belief, NYLIM also holds an equity interest in Defendant SR Limited, hereinafter referred to as "SRL", and continues to enjoy board representation in SRL.

10. Defendant International Finance Corporation , hereinafter referred to as "IFC", is a member of the World Bank Group with a business address at 2121 Pennsylvania Ave., NW, Washington, DC 20433. At all relevant times, IFC owned substantial shares in Defendant Religare Enterprises LTD, hereinafter referred to as "REL, and IFC maintained a representative on REL's Board of Directors until on or about April 24, 2017. Defendant IFC also holds an equity interest in Defendant SRL.

11. Defendant Siguler Guff & Company, LP , hereinafter referred to as "Siguler", is a United States company with a business address at 200 Park Ave., 23rd Floor, New York, NY 10166. At all relevant times, Siguler owned approximately 6% in Defendant RFL through Resurgence PE Investments Limited (formerly known as Avigo PE Investments Limited). Siguler also holds an equity interest in SRL.

12. Defendant Fortis Healthcare Limited ("Fortis Ltd.") is a public company with a business address at Tower A, Unitech Business Park, Block – F, South City 1, Section – 41, Gurgaon, Haryana - 122001. Fortis Ltd. has essential links to the United States and was formed from the proceeds of a crime which happened in the United States.

13. Defendant IHH Healthcare Berhad hereinafter referred to as "IHH Berhad", is a Malaysian company with a business address at Level 11 Block A, Pantai Hospital Kuala Lumpur, 8 Jalan Bukit Pantai, 59100, Malaysia. IHH Berhad is the shareholder of Fortis Ltd. and is an investee company of Defendant Khazanah Nasional Berhad and Defendant Mitsui & Co. Ltd. IHH Berhad has essential links to the United States and is processed through 101 California Street, Suite 4550 San Francisco, California.

14. Defendant, Khazanah Nasional Berhad of Level 22 Mercu UEM Jalan Stesen 5 Kuala Lumpur Sentral, Kuala Lumpur, is a sovereign wealth fund that operates in the United States through its duly constituted agent and representative Khazanah Americas Inc., with its principal place of business at 101 California Street, Suite 4550 San Francisco, California.

15. Defendants East Bridge Capital Master Fund Ltd. and East Bridge Capital Master Fund I Ltd. are affiliates of defendant East Bridge Capital Management LP (collectively referred to herein as "East Bridge"), which is a Delaware limited partnership with a business address at 1 Financial Center, Boston, Massachusetts. Defendants East Bridge Capital Master Fund Ltd. and East Bridge Capital Master Fund I Ltd. are shareholders of defendant Fortis Ltd and helped the RICO Defendants strategy of manipulating the ownership of Fortis Ltd. in order to defeat the interests of the Plaintiff.

16. Defendant Shakeeb Alam also at 1 Financial Center, Boston, Massachusetts is a high-ranking professional of East Bridge and a close associate of Shivinder Mohan Singh and Malvinder

Mohan Singh, hereinafter referred to as "the Singh Brothers", Shakeeb Alam, was recruited by the Singh Brothers, to from time to time, trade in securities on behalf of the Singh Brothers and in this case, to champion Defendant Khazanah and IHH Berhad to undertake the Fortis Ltd. transaction on favorable terms, only to defeat the vested interest of Emqore. Defendant Shakeeb Alam, it is believed, is a citizen of the United States and operates from 1 Financial Center, Boston, Massachusetts.

17. Defendant Religare Finvest Ltd., hereinafter referred to as "RFL", is an Indian company with its registered office at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi – 110019 and also represented by it principal director and Vice Chairman, Defendant Siddharth Dinesh Mehta, present at 19 Berkeley Street, Mayfair, London.

18. Defendant Religare Broking Ltd,. hereinafter referred to as "RBL" is an Indian company its registered office at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi – 110019 and also represented by it principal director and Vice Chairman, Defendant Siddharth Dinesh Mehta, present at 19 Berkeley Street, Mayfair, London.

19. Defendant Care Health Insurance, Ltd., hereinafter referred to as "CHIL", is an Indian company with its registered office 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi – 110019 and also represented by it principal director and Vice Chairman Defendant Siddharth Dinesh Mehta, present at 19 Berkeley Street, Mayfair, London.

20. Defendant DBS Bank, hereinafter referred to as "DBS", the successor in interest to LVB Bank, with its agency office at DBS, 725 South Figueroa Street, Suite 2000, Los Angeles.

21. Defendant Ares Management Corporation, hereinafter referred to as "Ares", with a business address 2000 Avenue of the Stars 12th Floor Los Angeles, is a United States corporation.

22. Defendant Bay Capital Partners Ltd,. hereinafter referred to as "Bay Capital", has its registered office at Unit 1, G C, Ground Floor, 19 Bank street, Cybercity, Ebene 72201, Republic of Mauritius, through its principal Defendant Siddharth Dinesh Mehta 19 Berkeley Street, Mayfair, London. Defendant Bay Capital has essential links with the United States, has raised 90% of their funds from the United States and is registered with the SEC.

23. Defendant Siddharth Dinesh Mehta is the Chief Investment Officer and Co-Founder of Bay Capital at 19 Berkeley Street, Mayfair, London and used his experience and resources in public, media and government relations to use the false and fraudulent claims as the basis for the RICO Defendants' public pressure campaign against the Plaintiff.

24. Defendant Ares SSG part of Ares Management Corporation, hereinafter referred to as "Ares", and available at 2000 Avenue of the Stars 12th Floor Los Angeles. Ares SSG has raised funds from United States pension funds and has its center of management and control in the United States.

25. Defendant Sham Maheshwari is an Investment Management or Investment Head of Ares SSG, at 2000 Avenue of the Stars 12th Floor Los Angeles, assisted the RICO Defendants in the development of their public pressure campaign and, often in concert with Siddharth Danesh Mehta, in authoring false and misleading press releases and media statements about the Plaintiff in furtherance of the RICO Defendants' extortionate scheme.

26. Defendant Mistui & Co (USA), Inc. is located at 200 Park Avenue, New York.

27. Defendant Religare Enterprises, Ltd., hereinafter referred to as "REL", is an Indian company with a business address at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi – 110019 and is processed through its Vice Chairman, controlling member and director at 19 Berkeley Street, Mayfair, London.

28. Defendant RHC Holdings Private Limited, hereinafter referred to as "RHC Holdings", is an Indian company with a business address at 54, Connaught Place, Janpath, New Delhi, Delhi 110001.   RHC Holdings is the private investment vehicle of the Singh Brother and one time majority shareholder of REL and Fortis Ltd.

29. Defendant SRL Limited ("SRL") is an Indian company and a subsidiary of Fortis Ltd. and hence a subsidiary of Defendant IHH Healthcare Berhad, hereinafter referred to as "IHH Berhad", and an investee company of Defendant Khazanah Nasional Berhad with a business address at GP-26, Maruti Industrial Est Udyog Vinar, Sector – 18, New Delhi, 122015 India and is processed through 101 California Street, Suite 4550 San Francisco, California.

30.  Defendants ABC Corp. 1-10 and John and Jane Does 1-10 are entities and/or persons whose identities are unknown and who may have liability for the actions complained of by the Plaintiff herein.

## NON-PARTY DEFENDANTS

31. Certain other non-party individuals and business entities played roles, direct or indirect, in the scheme to defraud and extort Emqore of their rights. Foremost among these individuals and business entities are the following.

32. Daiichi Sankyo, Inc., hereinafter referred to as Daiichi Sankyo, through its agency offices at 211 Mount Airy Rd, Basking Ridge, New Jersey.

33. Defendant Ravi Rajagopal is an individual with an address at Unitech Business Park, A, Netaji Subhash Marg, Block F, South City I, Sector 41, Gurugram, Haryana 122001, India, with essential links to the United States on account of his position, rallied other co-defendants and participated in the subsequent obstruction of Plaintiff's efforts and forced others including Defendant Bhavdeep Singh to provide false testimony.

34. Defendant Northern TK Venture Pte. Ltd. ("NTVP") is a Singaporean company with a business address at 111, Somerset Road, # 15-01, Triple One Somerset, Singapore 238164.

35. Defendant India Horizons Fund Ltd. ("IHF") is a Mauritian company with a business address at C/O Apex Fund Services (Mauritius) Ltd., 4th Floor, 19 Bank Street, Cybercity, Ebene, Mauritius O4 72201.

36. Defendant Resilient India Growth Fund ("RIGF") through Globefin Management Services, First Floor, Anglo Mauritius House, Port Louis, Mauritius.

37. Defendant Rashmi Saluja, the Chairman of REL, is the political muscle of the RICO Defendants and is present at 2nd Floor, Rajlok Building, 24, Nehru Place, New Delhi - 110019.

38. Defendant State Bank of India at State Bank Bhawan, M.C. Road, Nariman Point, Mumbai, Maharashtra, India, is India's larges public sector bank, a Government of India Entity and Undertaking, that has continued to ignore proceedings and orders and transact assets of REL.

39. Defendant Reserve Bank of India at Central Office Building Shahid Bhagat Singh Road Mumbai-400 001 is the Indian Central Bank and Financial Institution Regulator that regulates one or more the REL entities and has continued to ignore the continued fraud.

40. The Securities Exchange Board of India at Plot No.C4-A, 'G' Block Bandra-Kurla Complex, Bandra (East), Mumbai, is the Indian securities regulator that has continued to review the obvious securities law violations by REL and Fortis Ltd.

41. Defendant IDBI Trusteeship Services Limited ("IDBI") at Asian Building, Ground Floor, R Kamani Marg, Ballard Estate, Mumbai, is also a Government of India Undertaking, IDBI despite having knowledge and notice, under the express instructions of Defendants, Bay Capital, Siddharth Dinesh Mehta and Sham Maheshwari, illegally sold the listed shares that were to be

acquired by Emqore frustrating the transaction structure(s) for the Plaintiff's Predecessor's deals for Fortis Ltd. and REL.

42. Defendant Northern TK Venture Pte. Ltd. ("NTVP") is a Singaporean company with a business address at 111, Somerset Road, # 15-01, Triple One Somerset, Singapore 238164.

43. Defendant Religare Health Trust, hereinafter referred to as "RHT", is a Singaporean company with a business address at 80 Raffles Place, #11-20 UOB Plaza 2, Singapore.

44. Defendant Ranchem Private Limited is an Indian company, controlled by the Singh Brothers and is registered at is an Indian company with a business address at G-16, Marina Arcade, Connaught Circus, New Delhi - 110001.

45. Defendant Fortis Healthcare Holdings, hereinafter referred to as "Fortis Holdings", is an Indian company with a business address at Tower A, Unitech Business Park, Block – F, South City 1, Section – 41, Gurgaon, Haryana - 122001. Defendant Fortis Holdings has essential links to the United States and was formed from the proceeds of a crime which happened in the United States.

46. Defendant SS Kothari Mehta & Company, hereinafter referred to as "SSKIM", are the auditors of REL, who have been issuing fraudulent audits to suppress the claims of the Plaintiff and the Plaintiff's Predecessors. SSKM operate through Plot No. 68, Okhla Phase III, New Delhi 110020.

47. Omitted.

## JURISDICTION

48. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c). Plaintiff's first claim for relief arises under 18 U.S.C. § 1961 et seq., as hereinafter more fully appears. There is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

49. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events originated in this District, and also under 18 U.S.C. § 1965.

50. The citizenship of Emqore is diverse from the citizenship of all Defendants.

51. Defendants Malvinder Mohan Singh and Shivinder Mohan Singh have more than minimum contacts with New Jersey. Under the government of the Singh Brothers Ranbaxy USA and Ranbaxy introduced into interstate commerce adulterated drugs. When Ranbaxy USA pleaded guilty to three felony FDCA counts, and four felony counts of knowingly making material false statements to the FDA it was the conduct undertaken by the Singh Brothers in New Jersey for the specific purpose of inflating the sale price to Daiichi Sankyo. Malvinder Singh was a director of Ranbaxy Pharmaceuticals, Inc., a company related to Ranbaxy, USA, which had its principal place of business at 600 College Road, Princeton, NJ. The proceeds of this crime, were affected in the lawful currency of the United States and utilized for investments in RICO Member businesses, including but not limited to REL and Fortis Ltd. Exercise of jurisdiction over the Singh Brothers is reasonable and proper in this District.

52. Defendant Bhavdeep Singh is a resident of New Jersey.

53. Shakeeb Alam is a resident or citizen of the United States. Defendant has used the United States, through other United States and India domiciled RICO Defendants engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the

13

United States of those acts and was working at the direction, under the control, at the request, and/or on behalf of Singh Brothers.

54. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

55. Defendant Fortis Ltd. has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Fortis Ltd., through its Chief Executive Officer, performed acts in furtherance of the scheme within New Jersey. Defendant was funded by the proceeds of the crime in New Jersey. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

56. Defendants East Bridge has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, East Bridge and East Bridge Capital Management LP were substantial shareholders of Fortis Ltd. who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme within New Jersey. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of

14

the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

57. Defendant IHH Berhad has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, IHH Berhad was a co-conspirator who participated in the scheme with Fortis Ltd. and directed acts in furtherance of the scheme in New Jersey. IHH Berhad, knew, should have known or was reckless in not knowing that Defendant Shakeeb Alam, was acquiring a position in Fortis Ltd. at the request of the Singh Brothers, with the intention of defeating the rights of the Plaintiff. Even though IHH Berhad, had earlier walked away from Fortis Ltd. on account of issues of fraud. Defendants East Bridge and Shakeeb Alam, under the instructions of the Singh Brothers, offered IHH Berhad a transaction below the value agreed with the Plaintiff. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

58. Defendant, RHC Holdings, has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RHC was the recipient of the funds of the Singh Brothers Crime which originated in the United States and was the vehicle which was used to fund REL and Fortis Ltd. with illegal proceeds of crime. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the

effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

59. Defendant REL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, REL, through its significant shareholders and / or co-conspirators, IFC, Siguler and NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

60. Defendant RFL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RFL, through its significant shareholder and co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

61. Defendant RBL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, RBL, through its significant shareholder and co-conspirator IFC, the equity holder of

16

REL, based in the United States, conducted affairs of the Defendants and the enterprise through the United States. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

62. Defendant CHIL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, CHIL., through its significant shareholder and co-conspirator IFC, the equity holder of REL, based in the United States, conducted affairs of the Defendants and the enterprise through the United States.. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

63. Defendant SRL has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, SRL, through its significant shareholder and co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The Defendant has used the United States, through the United States domiciled RICO Defendants as conduits for funding their wrongful activities in and have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States knowing the effects in the United States of those acts and were working at the

direction, under the control, at the request, and/or on behalf of the Defendants in the United States in committing those acts.

64. Defendant DBS has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Whether or not the individual Defendant were or are aware of the fraud that has been perpetrated by the RICO Defendants and their coconspirators in their names, the Defendant cannot benefit from the fraud and corrupt acts perpetrated whether or not perpetrated on their behalf. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

65. Defendant NYLIM is domiciled in New Jersey.

66. Defendant IFC has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, IFC, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

67. Defendant Siguler has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Siguler, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

68. Defendant Bay Capital has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Bay Capital, through its dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

69. Defendant Siddharth Dinesh Mehta has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Siddharth Dinesh Mehta, the CIO of Bay Capital, through his dealings with co- conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. Defendant has also engaged in intentional, wrongful, illegal, and/or tortious

19

acts the effects of which Defendant knew and intended would be felt in the United States. For example, Defendant has directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States to influence citizens of the United States for the purpose of extorting the Plaintiff. Also, as set forth more fully herein, Plaintiff's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States. Defendant was aware of the effects in the United States of those acts, the activities of the RICO Defendant's co-conspirators and agents were to the benefit of the Defendant, and his coconspirators and agents were working at the direction, under the control, at the request, and/or on behalf of the Defendant in committing those acts.

70. Defendant Ares, is headquartered in the United States. Whether or not the individual Defendant were or are aware of the fraud that has been perpetrated by the RICO Defendants and their coconspirators in their names, the Defendant cannot benefit from the fraud and corrupt acts perpetrated whether or not perpetrated on their behalf. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

71. Defendant Ares SSG has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Ares SSG, through its dealings with co-conspirator NYLIM, which is located

in New Jersey, directed acts in furtherance of the scheme in New Jersey. Defendant has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Defendant knew and intended would be felt in the United States. For example, Defendant has directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States to influence citizens of the United States for the purpose of extorting the Plaintiff. Also, as set forth more fully herein, Plaintiff's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States. Defendant was aware of the effects in the United States of those acts, the activities of the RICO Defendant's co-conspirators and agents were to the benefit of the Defendant, and his coconspirators and agents were working at the direction, under the control, at the request, and/or on behalf of the Defendant in committing those acts.

72. Defendant Sham Maheshwari has certain minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. More specifically, Sham Maheshwari, a principal of SSG, was a co-conspirator who through his dealings with co-conspirator NYLIM, which is located in New Jersey, directed acts in furtherance of the scheme in New Jersey. Defendant has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Defendant knew and intended would be felt in the United States. For example, Defendant has directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States to influence citizens of the United States for the purpose of extorting the Plaintiff. Also, as set forth more fully herein, Plaintiff's co-conspirators and agents

have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States. Defendant was aware of the effects in the United States of those acts, the activities of the RICO Defendant's co-conspirators and agents were to the benefit of the Defendant, and his coconspirators and agents were working at the direction, under the control, at the request, and/or on behalf of the Defendant in committing those acts.

73. Defendant Mitsui is based on the United States acting as an agent for its parent Mitsui & Co. Ltd. of Japan. Whether or not the individual Defendant were or are aware of the fraud that has been perpetrated by the RICO Defendants and their coconspirators in their names, the Defendant cannot benefit from the fraud and corrupt acts perpetrated whether or not perpetrated on their behalf. The exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. There is a substantial nexus between Defendants purposeful availment of the New Jersey forum and Plaintiff's claims.

74. Plaintiff Emqore is a Wyoming trust and completely diverse to all Defendants.

75. This Court has diversity jurisdiction pursuant to 28 U.S.C.A. § 1332.

76. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C.A. § 1964.

77. This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C.A.§ 1367(a).

## VENUE

78. Venue of this action is proper in the United States District Court for the District of New Jersey by virtue of 28 U.S.C.A. § 1391(b)(3).

## PROCEDURAL HISTORY

79. On or about January 24, 2018, the RICO Defendants, arranged for the Singh Brothers to receive an indemnity for their conduct viz. a viz. the management of REL and Fortis Ltd.[2].

80. On December 18, 2017 Plaintiff's Predecessor[3], through the target company, filed a case in the National Company Law Tribunal at the behest of Emqore to stop the illegal misappropriation of the listed shares by Ares SSG and Bay Capital, undertaken by IDBI, the legal owner of the said shares. In that proceeding the court ordered a complete status quo on the dealing with those shares. In the most audacious show of "brute power" and absolute disregard for judicial process, RICO Defendants, perpetrated a fraud on the court by withdrawing this litigation taking an imposter advocate who claimed to represent the interests of Plaintiff's Predecessor.

81. On February 22, 2018, in order to protect the put option by REL, the Plaintiff's Predecessor[4], filed an action in the High Court of Delhi. Giving special and specific credibility to the put option, the High Court ordered:

> The present suit is filed by the plaintiffs under section 34 read with section 38 of the Specific Relief Act, 1963 seeking a decree declaring that defendant No.1 is bound by the sanctioned letter dated 04.12.2017. A decree is also sought in favour

---

[2] This documented indemnity was provided by REL and then unilaterally withdrawn by REL on account of regulatory pressure, but, continues to be asserted by the Singh Brothers. An indemnity is also implied qua Fortis Ltd. as IHH Berhad at no point, since taking over, or, as part of the acquisition, insisted upon the return of the siphoned funds by the Singh Brothers. The Plaintiff's Predecessors meanwhile had structured replacement assets / capital to be contributed by the Singh Brothers and was pursuing remedies against other RICO Enterprise members.
[3] Action was filed by SGGD Projects Development Private Limited at the request of Loancore Servicing Solutions Private Limited a variable interest entity of Emqore, wherein Loancore Servicing Solutions Private Limited was authorized by SGGD Projects Development Private Limited to defend the action.
[4] The action was commenced by Participation Finance & Holdings (India) Private Limited and Strategic Credit Capital Private Limited and subsequently Loancore Servicing Solutions Private Limited, an indirect Emqore Variable Interest Entity, after acquiring the interests of Participation Finance & Holdings (India) Private Limited and Strategic Credit Capital Private Limited moved an application for substitution, which is currently sub judis.

of the plaintiffs declaring that the letter dated 08.11.2017 is binding on defendant No.3. Other connected reliefs are also sought. The learned senior counsel appearing for the plaintiffs relies upon the letter dated 08.11.2017 issued by defendant No.3 and deed of assignment dated 01.11.2017 by which defendant No.3 is said to have assigned the trademark 'Religare' as explained in Schedule A of the Assignment Deed and also upon the corporate guarantee given by the plaintiff vide Resolution of Board of Directors dated 09.12.2017. He submits that in view of the change of composition of the Board of defendant No.3, the plaintiffs apprehend that the new Board of defendant No.3 may try to resile from the aforesaid understanding/agreement. He submits that they may attempt to take steps for dilution of the value of the trademark in question. The plaintiffs have made out a prima facie case in their favour. The parties will maintain status quo regarding the trademark as described in the Schedule A to the Assignment Deed dated 01.11.2017. The learned senior counsel for the plaintiffs has filed an additional affidavit along with some documents. These are taken on record. Registry may scan the same and place it on record.

82. On February 26, 2020, in the matter of Fortis Ltd. Plaintiff's Predecessors[5] filed an action in the District Court, New Delhi and the Judge made the following observation:

I have heard and considered the submissions of Ld. Counsel for the plaintiff and perused the record. It seems that it is in the interest of justice to issue notice to the defendants on filing PF, RC, speed post and through authorised courier within three days, notice be given dasti, as prayed, however, any transaction taken place by the defendants in favour of any third party after the service of the notice of the present suit, affecting the interest of the plaintiff shall be subject to orders passed in the present suit.

83. On or about March of 2020, the Plaintiff's Predecessor[6], commenced a litigation against Non-Party Defendant, SSKIM for fraudulent accounting practices but was forced to withdraw the said litigation on account of threats, including threats of violence.

84. Despite such compelling orders, both REL and Fortis Ltd. have sought to change their brand names and REL has also gone and changed the brand names of its major health insurance

---

[5] The action was commenced by Participation Finance & Holdings (India) Private Limited and subsequently Walmark Holdings Limited, an indirect Emqore Variable Interest Entity, after acquiring the interests of Participation Finance & Holdings (India) Private Limited moved an application for substitution, which is currently sub judis.
[6] Loancore Servicing Solutions Private Limited

subsidiary to Care. The acts of the RICO Defendants, here and elsewhere, show a blatant, fatal and dangerous obstruction of justice.

85. On or about March 11, 2018, and August 18, 2018, which date is approximate, the Plaintiff's filed the following complaints: a) with the Securities Exchange Board of India; b) with the Reserve Bank of India, c) with the Economic Offenses Wing and c) Under ICSID (using the protections of the bilateral treaty protections given to Emqore's variable interest entities and financiers. Through the filing of false affidavits, manipulation and obstruction of justice, abuse of the judicial process, theft of records, these complaints continue to be pending.

86. As a follow on to the litigation, which was illegally withdrawn as part of the scheme of the enterprise, on March 3, 2019, Plaintiff's Predecessor[7] filed a petition to restrain the shares fraudulently seized by defendants Ares SSG and Bay Capital and taking cognizance of Emqore's position the National Company Law Tribunal noted that any transaction of those listed shares pertaining to the REL and Fortis Ltd. transaction would be subject to the orders under that proceeding. The Plaintiff's Predecessor, based on this finding filed a subsequent proceeding to enforce the issuance of shares[8].

87. On or about March of 2019, Plaintiff's Predecessor[9] commenced arbitration against Fortis Ltd. but voluntarily withdrew it as it was unable to add other non-contractual parties.

88. On or about December 2018, in response to the multiple complaints filed by Plaintiff's Predecessors, to show an arms-length dealings with the Singh Brothers, RICO Defendants, through REL filed criminal complaints against the Singh Brothers. The said complaints were also filed as part of the scheme, to criminally deprive Emqore of its entitlements.

---

[7] Loancore Servicing Solutions Private Limited
[8] Under Section 9 of the Insolvency and Bankruptcy Act of India 2016; filed under the Penalty Fee Agreement as highlighted in Exhibit A
[9] Walmark Holdings Limited.

89. December 17, 2018, he Supreme Court of India ordered a stay on the deal following a filing from Tokyo-based Daiichi Sankyo Co. Ltd..

90. On March 31, 2019, the then Chairman of REL, ratified the agreement(s) executed by Plaintiff's Predecessor[10] and REL, which REL had been denying[11].

91. On or about October of 2019, the Singh Brothers, in order to avoid the contempt proceedings initiated by the Supreme Court of India under the Daiichi Sankyo proceedings, which were sure to attract imprisonment, collaborated with the RICO Defendants to orchestrate their own arrests.

92. On November 18, 2019, the Supreme Court of India held that the transaction of IHH Berhad with Fortis Ltd. including the acquisition of the assets of Non-Party Defendant, RHT Health Trust, was "clandestine and dubious" and violative of the orders of the Supreme Court.

93. On or about July 22, 2020, representative of Plaintiff's Predecessor[12] was attacked by assailants[13], who demanded the retraction of the proceedings filed in the National Company Law Tribunal objecting to the illegal sale of shares of IDBI on behalf of Bay Capital and SSG Ares.

94. On August 23, 2020, Emqore filed a formal petition with Non-Party Defendants, the State Bank of India, objecting to the sale of assets of REL, which petition was woefully ignored by the State Bank of India and a process for sale of subsidiaries was commenced.

95. On or about November of 2020, representatives of Plaintiff's Predecessors, were threatened to cancel the assignment agreements with Plaintiff's Predecessors[14]. When no heed was

---

[10] Loancore Servicing Solutions Private Limited
[11] In a similar scheme, Bhavdeep Singh continues to deny the allegations.
[12] Loancore Servicing Solutions Private Limited
[13] During the Daiichi Sankyo proceedings it came to light that the Singh Brothers often told witnesses "I know where you live." This is a common sentence that all of Plaintiff's Predecessors have come to hear from different members of the enterprise.
[14] Directors of Participation Finance and Holdings (India) Private Limited and Strategic Credit Capital Private Limited, were intimated into reversing the assignment transaction with Loancore Servicing Solutions Private Limited and Walmark Holdings Private Limited.

given to these extortionate threats, in a most bizarre incident, RICO Defendants, filed criminal investigation petitions under a case which was settled in the High Court of Mumbai with consent degrees and consent terms duly recorded.

96. On July 8, 2020, based on a petition by Daiichi Sankyo, the High Court of Delhi, ordered a restraint on the brands of REL and Fortis Ltd. in favor of Daiichi Sankyo, which were originally alienated in favor of the Plaintiff's Predecessors. Despite service and notice to the contrary Daiichi Sankyo had failed to mention the presence of the interim injunctions granted to Plaintiff's Predecessors.

## FACTS COMMON TO ALL COUNTS

97. This civil racketeering action arises from an illegal scheme involving mail and wire fraud, bankruptcy fraud, tortious interference, and abuse of process by the brothers Malvinder and Shivinder Mohan Singh (Brothers Singh), and their confederates (collectively, the "RICO Enterprise"), aimed at stripping Emqore or the Plaintiff Predecessors (used interchangeably) valuable contractual rights to control Fortis Ltd. and REL that Emqore had acquired pursuant to its multimillion dollar planned investment in REL and Fortis Ltd. when every other suitor had refused to indulge with these errant and now incarcerated promoters[15].

---

[15] In or about 2008, the Singh Brothers sold their majority-stake in Ranbaxy Limited ("Ranbaxy"), India's leading pharmaceutical company, to Daiichi Sankyo of Japan. Upon information and belief, the Singh Brothers formed REL and Fortis Ltd. utilizing the proceeds of the sale of their shares in Ranbaxy. In or about 2016, Daiichi Sankyo commenced an arbitration proceeding against the Singh Brothers based upon the Singh Brothers' concealment of information prior to and following the sale of their shares. More specifically, Daiichi alleged that the Singh Brothers concealed information and fabricated data relating to the number of Ranbaxy products granted approvals by the United States Food and Drug Administration. In 2016, Daiichi Sankyo obtained a $500 million award in the arbitration and India's Supreme Court upheld the award. Daiichi Sankyo aggressively pursued collection activities against the Singh Brothers. However, by that time, REL and Fortis Ltd, the fruit of the Singh Brothers' criminal activities, had grown into financial giants commanding market capitalizations of approximately $3 billion each. Having run the coffers of REL and Fortis Ltd. dry the Singh Brothers while representatives of some of the United States' leading financial institutions, including NYLIM, IFC and Siguler, sat on the Boards of REL and Fortis Ltd. and facing an existential crises on account of the Daiichi Sankyo judgment. Upon information and belief, the Board Members the Singh Brothers decided to sell substantial stakes in REL and Fortis Ltd. to outside investors and appointed bankers to

98. The RICO Enterprise[16] -- using improper tactics for which the Brothers Singh has repeatedly been cited and sanctioned in other cases[17] -- carried out the scheme in an effort, among other things, to enable the defendants Bay Capital and Ares SSG to directly or indirectly acquire REL and for IHH Berhad to acquire Fortis Ltd., both valuable assets at fire sale prices brought about by the Defendant's collective conduct.

99. By the time the full nature, scope and goal of the RICO Enterprise came to light, it was too late for Emqore to prevent the loss of Emqore's rights under its binding agreements with Religare and Fortis. This Court (unlike any other competent court) has jurisdiction over the claims asserted herein and personal jurisdiction over the key Defendants. Accordingly, Emqore brings this action for, among other things, violation of the federal Racketeering Influenced and Corrupt Organization Act ("RICO").

100.    Defendants' conduct was, as the Supreme Court of India recently determined in an unrelated but loosely affiliated matter, an affront to the judicial process, in which Defendants abused court proceedings, withheld crucial evidence, and engaged in a troubling pattern of noncredible testimony. Defendants wrongfully and deceptively created chaos in proceedings so that Emqore would lose control of dues that Emqore was contractually entitled. That loss of control has already damaged Emqore significantly.

---

undertake these stake sales. With no takers, the Singh Brothers aggressively pursued the Plaintiff's Predecessors with a package of generous inducements, based on which the Plaintiff's Predecessors transacted with REL and Fortis Ltd.
[16] The felony conviction in the United States resulting from the conduct of Ranbaxy USA, had shown that the Singh Brothers, in their race for profit, had lied to regulators, falsified data, and endangered patient safety in almost every country where it sold drugs. Drafting the most scrupulous employees / entities into the company's fraudulent schemes.
[17] Under the RICO Defendants, it is believed that most employees are seeking guidance on how best to lie to regulators, others are concerned about the fraud they were expected to commit as part of their job. Singh Brothers though enforced this conduct with an iron fist, when members balked at filing false data or refused to participate in illegal acts, they were left un-employable.

101.    The Brothers Singh and their RICO Enterprise members pursued their abusive scheme through wire, mail and bankruptcy fraud, abuse of process, tortious interference with contract, and obstruction of justice to: (a) surreptitiously obtain control of REL and Fortis Ltd. in breach of the governing agreements; (b) make grossly undervalued bids for REL and Fortis Ltd.; and then (c) in a ploy to remove the obstacle presented by Emqore's/Plaintiff's Predecessors desire to maximize the value of the estate by making the Brothers Singh and the co-defendants pay for their follies, misrepresented the adequacy of those bids, threw suspicion on the authenticity of the agreements and charged that by opposing them, Emqore was actually participating in some gross misconduct, when in fact Defendants knew that Emqore's assessment of Emqore's value was entirely consistent with valuations they themselves had prepared and later withheld from production. As a result of the RICO Enterprise's fraudulent conduct the newly appointed boards of REL and Fortis Ltd. stripped Emqore of its control rights pursuant to contracts.

102.    Emqore is a private investment trust that operates through a network of investment vehicles, that were aggressively pursued by the Brothers Singh to invest in REL and Fortis Ltd. Under the provisions of the agreements entered into by Emqore/Plaintiff's Predecessors -- of which Defendants were at all relevant times aware -- Emqore/Plaintiff's Predecessors is afforded expansive protections and penalty fees, in order to circumvent which the Defendants extended and expanded the workings of the enterprise.

103.    RICO Enterprise leaders the Brothers Singh have been in a fraudulent spree in the United States. Malvinder and Shivinder Mohan Singh (Singh Brothers) inherited a pharmaceutical business from their father, called Ranbaxy Laboratories Limited (Ranbaxy). They sold Ranbaxy at its peak to Japanese drug maker Daiichi Sankyo in 2008 for $4.6 billion, out of which $2.4 billion went to them. the sale proceeds was fueled their ambitions and they invested the money for

expansion of REL and Fortis Ltd.. In 2013, which was the largest drug safety settlement, Ranbaxy USA Inc., a subsidiary of Indian generic pharmaceutical manufacturer Ranbaxy, pleaded guilty today to felony charges relating to the manufacture and distribution of certain adulterated drugs made at two of Ranbaxy's manufacturing facilities in India. Ranbaxy also agreed to pay a criminal fine and forfeiture totaling $150 million and to settle civil claims under the False Claims Act and related State laws for $350 million. The Justice Department brought about the charges and the settlement was undertaken in the United States. The joint criminal and civil settlement, reflected many years of work by FDA agents and federal prosecutors, held Ranbaxy accountable for a pattern of violations. Daiichi Sankyo being caught off guard sued the Singh Brothers on the basis that the Singh Brothers "deliberately" concealed crucial data with the intention of hiding their own irregularities – alleged fraud and falsehood and obtained an arbitral award in the amount of approximately $600 million and began enforcement proceedings in India for the said award. It is therefore undoubtable that both REL and Fortis Ltd. e were spawned from proceeds of a crime which took place in the United States and was prosecuted in the United States. That at all times material all funding for REL and Fortis Ltd. came from proceeds of a crime and was in United States Dollars.

104.    Knowing the crimes as perpetrated would soon unfold, the Brothers Singh, recruited RICO Enterprise Members IFC, NYLIM and Siguler to invest in REL and Fortis Ltd. (through SRL) to lend credibility to the enterprise and apparently without much, if any diligence, sometime in 2012, International Finance Corporation (IFC) agreed to invest funds in REL and SRL, currently a subsidiary of Fortis. Funds of the United States. Even though the Daiichi Sankyo scandal took center stage of most business media publications in India by May 2013, IFC continued with the investment and stuck with it. Lending their seal of approval to what should be considered

as the largest criminal enterprise or combine. RICO member Bay Capital was an investor in REL and RICO member Ares SSG provided financing to family members of the Brothers Singh enabling the Brothers Singh to exercise complete dominion and control over REL.

105.    Representatives of IFC joined the board of REL were part of the related party transaction committee and had active direct / indirect representation in Fortis, during a period when the Singh Brothers robbed these enterprises of close of $2000 million if not more while RICO Enterprise Members, stood sentry.

106.    Collectively RICO Enterprise Members had complete governing control over Religare and Fortis and therefore this is not a case of breach of fiduciary duty or irresponsible conduct, it is the case where the presence of IFC and the deliberate ignorance demonstrated by IFC resulted in the complete annihilation of value. Whether NYLIM or Siguler followed IFC to invest in REL and Fortis Ltd. or the other way around, it is quite clear that the decisions to invest in the lawful currency of the United States originated in the United States and was not conceptualized in India.

107.    In 2016 IHH Berhad walked away from Fortis Ltd. on account of the Daiichi Sankyo judgment, in 2017 the media was rife with reports of fund siphoning by the Singh Brothers and in 2018, IHH Berhad was careful in pointing out in their public disclosures that there was a dispute with the brands (interestingly REL has not even mentioned the presence of the court orders restricting their brands in their financial statements. In the case of REL and Fortis Ltd. both we are shocked to review emphatic statements on the non-applicability of litigations to their business or operations) and yet they took no precaution(s) other than to structure a transaction which circumvented all these rights/obligations.

108.    When Emqore/Plaintiff's Predecessors discovered the gross financial misconduct, much prior to the public disclosures of this conduct and made demands on the RICO enterprise members IFC, NYLIM and Siguler to be held liable, instead, of rising to this call, Defendants knowingly and severally perpetrated the Fraudulent Scheme -- with the substantial assistance of Bay Capital and Ares SSG.  In furtherance of which and on behalf of the RICO Enterprise, RICO enterprise members IFC, NYLIM, Siguler, Bay Capital and Ares SSG created a united front, to take over REL and to block Emqore's control over REL. With a burning desire to oust Emqore from Fortis Ltd., being investors only in the subsidiary of Fortis Ltd., RICO Enterprise Members, IFC, NYLIM and Siguler in consultation with and the support of RICO Enterprise Member Khazanah, recruited East Bridge to acquire a stake in Fortis, call for a change of the board in order to deal Emqore the same fate. And in a complete reversal of events, convinced IHH Berhad, that had previously walked away from Fortis Ltd., to take over Fortis Ltd..

109.    As the RICO Enterprise secretly amassed equity positions in REL and Fortis Ltd. – the only constituent most concerned with maximizing the value of the estate -- was seeking to raise financing and directly negotiate a consensual plan of reorganization with creditors that would realize the true value of REL and Fortis Ltd.. In connection with these efforts, Emqore negotiated with creditors of REL and Fortis Ltd. and undertook to acquire and subsequently did acquire the leveraged brands of REL and Fortis Ltd.. Receiving in return a put option from both Religare and Fortis to buy back those brands from Emqore.

110.    To complete its goal of wresting away REL and Fortis Ltd. from Emqore / Plaintiff's Predecessors, the RICO Enterprise first had to strip Emqore of its control rights pursuant to the binding agreements (the "Fraudulent Scheme"). Concerned that Emqore would be successful in raising financing sufficient and make the RICO Enterprise Members pay for their egregious

conduct, and desperate to fulfill the Fraudulent Scheme, the RICO Enterprise moved swiftly to remove Emqore from the equation. The RICO Enterprise believed that, with Emqore unable to exercise its control under the binding agreements, Emqore would not be in a position to pursue a cause of action against the Defendants.

111.    Thus, on or about February of 2018, purposefully timed to interfere with Emqore's financing efforts and takeover of REL and Fortis Ltd., the RICO Enterprise Members took board control of REL and Fortis Ltd. and handed over the management of REL to Bay Capital and that of Fortis Ltd. to IHH Berhad. Defendants then leveraged the influence garnered by their illegal holdings to inform various parties, including potential lenders of Emqore that Emqore could not discharge its obligations under the Agreements. Unbeknownst to the parties and the various courts, however, Defendants were withholding critical documents that conclusively established that Defendants knew full well that Emqore was holding them liable for their criminal conduct and making them pay and thus that Emqore properly had opposed the transaction.

112.    To further ensure the success of a fire sale of REL and Fortis Ltd., however, the RICO Enterprise needed to neutralize Emqore's influence and they did by trumping charges against representatives of Emqore and Emqore and sought to create the impression that Emqore's interests -- to maximize the value of REL and Fortis Ltd. -- conflicted with their interests, which, Defendants asserted, would be served by embracing them. As Defendants knew, this was false. In fact, as Defendants knew, because Emqore was seeking to arrange for a plan that realized enabled the infusion of capital which had been siphoned from REL and Fortis Ltd. to flow back in. The Defendants also made fraudulent representations that they in fact had a better plan to maximize the value of REL and Fortis Ltd. when unbeknownst to the public at large the Defendants were only giving a pretextual reason for the cancellation of Emqore's rights. In so doing, the RICO

33

Enterprise hoped to further drive down the price of REL and Fortis Ltd. by increasing the company's desperation and risk of liquidation.

113.     With Emqore's planned negotiations in shambles, Defendants now fully in control of REL and Fortis Ltd., Emqore resigned from its now worthless contracts to explore alternative ways to salvage its investments. Had Emqore known that the Defendants were perpetrating a scheme to displace it would have taken actions to enforce and protect its rights. The actions of the RICO Enterprise has breached the outer limits of propriety. Moreover, in the course of its scheme, the RICO Enterprise tortiously interfered with Emqore's rights, committed fraud and abuse of process, and obstructed justice by withholding critical evidence that conclusively established that Emqore had binding contractual rights that placed a financial burden of at least USD 300 MN on the Enterprise. Members of the RICO Enterprise provided false testimony and made numerous misrepresentations, including, as alleged in further detail herein: (a) blatantly misrepresenting that members of Emqore were part of some conspiracy, (b) lying to courts that the RICO Enterprise had legitimate reasons to wrestle control out of Emqore when in fact they did so only to further disrupt Emqore's plan, (c) misrepresenting the involvement of RICO Enterprise Members in the takeover of REL and Fortis Ltd., (d) misrepresenting to the courts the authenticity of the put options granted for the buy back of the brands and the penalty agreements agreed to, and (e) misrepresenting to the parties and the courts the reasons for terminating the Emqore's bid.

114.     Abusing the judicial process to corrupt the legal rights of others is part of the RICO Enterprise's modus vivendi. Practices of the kind Defendants utilized here have led numerous courts in case after case to sanction some of the RICO Enterprise members for spoliation and contempt. Through this concerted pattern of illegal acts, the RICO Enterprise intentionally and through wrongful means caused Emqore to lose its rights and render performance impossible under

the acquisition agreements. Defendants have also caused Emqore to incur legal and professional fees in defending against Defendants' illegal conduct. Accordingly, Emqore seeks damages in an amount to be determined at trial, pursuant to the federal and state racketeering statutes predicated Defendants' mail and wire fraud, securities fraud, and obstruction of justice, (ii) for Defendants' tortious interference with the Emqore's agreements, and (iii) for Defendants' abuse of process. Emqore brings its claims before this Court because the majority of the witnesses are based in the United States, this Court has jurisdiction over all of the parties and the claims, and other court's do not have jurisdiction to hear or issue final orders with respect to them. Absent redress by this Court, Defendants' pattern of conduct shows a clear threat of continuing.

115.    Emqore has not pleaded the injuries alleged in this Complaint relating to the complete loss of its rights in any court. Emqore has sustained new injuries separate and apart from the injuries suffered as a result of the RICO Enterprise's continuing scheme and violation of the RICO statutes. Fraudulently concealed evidence has been discovered that could not have been previously discovered through due diligence, including, for example, the role of the Fraudulent Scheme to deprive other creditors of their rights. Defendants have committed and conspired to commit additional predicate acts in furtherance of their scheme.

### THE RICO ENTERPRISE PANIC WHEN THEY LEARN OF EMQORE'S INTEREST IN REL AND FORTIS LTD.

116.    After being aggressively pursued by the Singh Brothers, their bankers, JP Morgan for REL and Standard Chartered Bank for Fortis Ltd. during the period July 2017 and August 2017, which period is both approximate and inclusive, the respective Plaintiff's Predecessors enter into binding transactions with REL and Fortis LTD., as detailed in Exhibits A and B, respectively.

117.    After a failed year long process when no suitors had showed up, the Singh Brothers and the Bankers of REL and Fortis Ltd. offered the Plaintiff through the Plaintiff's Predecessors substantial incentives, including but not limited to "breakaway" fees and "penalties" for abandonment. During the due diligence that ensued Plaintiff's Predecessors found systemic fraud within REL and Fortis Ltd. and a concentrated effort by the RICO Defendants to dodge the Daiichi Sankyo judgment.

118.    Taking full precaution to adhere to all legal orders and injunctions by Daiichi Sankyo, the Plaintiff's Predecessors structured a transaction that would, amongst other things, infuse Euro 225 into REL and almost double that amount in Fortis Ltd. However, the transaction(s) were conditioned on the Singh Brothers and the RICO Defendants, IFC, NYLIM and Siguler, disgorging some of their profits.

119.    In fact the agreements proposed called for the Singh Brothers to fill the financial black holes in REL and Fortis Ltd. through new "asset" infusion. Additionally, on or about August 18, 2017, Plaintiff, via email, directly took offense with IFC, NYLIM and Siguler raising the issues "concealing the related party transactions and resigning from the boards of REL, RFL and Fortis Ltd.'s subsidiaries without alerting the public as to financial malfeasance that posed great threat to the stability of these listed enterprises.

120.    While observing the operations at Fortis Ltd. and REL, the Plaintiff also uncovered a fraud directed by IFC and Bay Capital, which called for Ares SSG, a distressed debt investor to purchase all the "related party loans" by issuance of "trust receipts." Thereby getting rid, forever of any remains of the financial misdealing within REL and Fortis Ltd. Incensed at this audacious scheme, Plaintiff, immediately called for the abandonment of such scandalous conduct, threatening to walk away.

## DEFENDANTS HAVE PERMITTED SERIAL SIPHONING OF FUNDS TO CRIMINALLY OBFUSCATED THE RIGHTS OF CREDITORS FOR YEARS

121.   The Brothers Singh were the principal shareholders (majority), Executive Chairman and Vice Chairman of the boards of directors, of both Religare and Fortis. In their roles using the ill-gotten gains from the sale of Ranbaxy to Daiichi Sankyo the Brothers Singh took Religare and Fortis on a wild acquisition spree. All of which came to a thundering halt when their fraud against Daiichi Sankyo became public and Daiichi Sankyo secured a judgment against the Brothers Singh and all their entities, including the entities which held shares for Fortis and Religare.

122.   Realizing that they had come to the end of their frolic, the excessively grandiose Brothers Singh, then with the assistance of the RICO Enterprise Members, IFC, NYLIM and Siguler, started encumbering their assets to Religare. To clarify, being shut out from all other funding sources on account of the Daiichi Sankyo case, the Brothers Singh, used approximately 23 entities to encumber assets and take funds from their owned companies REL and Fortis Ltd. without declaring related party transactions, all of which happened when the representative of RICO Enterprise Member, IFC, was on the board of REL's related party transaction committee and the representative of NYLIM, was on the board of RFL, the finance subsidiary and both of them equal representation in Fortis Ltd..

123.   Defendants IFC, NYLIM and Siguler, benefited from this pattern of thievery in terms of the inflated revenue and increased profits that enabled higher dividends all of which were transmitted using the lawful currency of the United States and distributed to these and other RICO Defendants.

37

124.   The most damning evidence that Emqore and the Plaintiff's Predecessors discovered was an elaborate schemed, tacitly sanctioned by IFC, NYLIM and Siguler, to hyperinflate the stock of a failing enterprises, ABG Shipyard Limited, using the illegal "buy and sell limits", "marking the trades," "wash sales," "interdealer tripped trades" and "scalping." Permitting ABG Shipyard Limited to borrow funds far greater than its creditworthiness, which was unsustainable and resulted in the insolvency of ABG Shipyard Limited, causing the public close USD 6 BN of losses. Labelled as the largest corporate fraud by the Reserve Bank of India, that the Plaintiff insisted would not have been transacted were it not for the stock manipulation tactics orchestrated by the RICO Defendants, Singh Brothers, RFL, IFC, NYLIM and Siguler. When the Plaintiff, via legal notice December 3, 2018, ordered the involved parties to voluntarily discover this scam to the regulators, it was the beginning of the end for the Plaintiff's Predecessors.

125.   Shortly thereafter RICO Enterprise Members, employing a three-step strategy – began the Fraudulent Scheme to obfuscate the rights of Emqore just like it had done with Daiichi Sankyo. To wit, they first gained control of a substantial majority of REL and Fortis Ltd., either by acquiring shares, as RICO Enterprise Member East Bridge or by consolidating their holdings by creating an association in fact, as RICO Enterprise Members IFC, Bay Capital and Ares SSG did; they then undertook an optical change of management and then finally handed control of REL to Bay Capital and of Fortis Ltd. to IHH Berhad.

126.   The RICO Enterprise Members proposed the Fraudulent Scheme, with the intention not to maximize its return on their acquisition but to enter a strategic transaction with a group of allies that would not highlight their fraud but continue to conceal it. The entirety of the Fraudulent Scheme would not have been accomplished without the inclusion of Defendant Khazanah  that played a critical role in luring back IHH, that had previously walked away from Fortis on account

of the Daiichi Sankyo Judgement. All of which was enabled by Defendant Shakeeb Alam and East Bridge. While appearing to be independent the RICO Enterprise Members were in fact associated and continued their allegiance to the Brothers Singh.

127.    As a result of these tactics, the Enterprise Members took control of REL and Fortis Ltd., announcing to the world that they had gotten rid of the criminal Brothers Singh and that REL and Fortis Ltd. were not independent enterprises. Interestingly neither of them did anything to recover the siphoned funds from the Brothers Singh, which Emqore had insisted in its acquisition agreements and not until Emqore filed complaints with the securities regulator did these entities file criminal complaints against the Brothers Singh, which resulted in the arrest of the Brothers Singh.

128.    Had the Defendants been interested in safeguarding the interests of REL and Fortis Ltd., their representatives would not have exit REL and Fortis Ltd. without disclosing the fraudulent conduct nor re-entered REL and Fortis Ltd. without taking more precaution to preserve the value of these entities and holding the Singh Brothers accountable.

## THE RICO ENTERPRISE TERMINATES EMQORE'S RIGHTS UNDER FALSE PRETENSES AND ENGAGES IN FURTHER WRONGDOING

129.    However, in a tearing hurry to gain control the RICO Enterprise Members took control of REL and Fortis Ltd. in a highly suspect manner. But before they did so they entered into sham litigations that to distance themselves from the fraud that they had orchestrated.

## THE OPPRESSION AND MISMANAGEMENT SHAM LITIGATION

130.    On or about June of 2017 through to September of 2017, which period is both approximate and inclusive, Defendants, Bay Capital and Ares SSG, themselves or using "litigation fronts" commenced litigation against the Singh Brothers accusing them, in part, of "oppressing" minority shareholders by degrading the value of REL and Fortis Ltd. Outlining in great detail the fund siphoning which had happened at REL and Fortis Ltd..

131.    During the same period, while publicly opposing the conduct at REL and Fortis Ltd. the same Defendants were negotiating transactions to conceal the fund siphoning at REL and Fortis Ltd.. The litigation was fought as much in the media as in courts of justice and the intended affect of which was to drive down the share price of REL and Fortis Ltd. and during this period the shares of these two entities did go into free fall. In the case of REL falling by almost 90% and in the case of Fortis Ltd. by around 50%.

## THE ALLEGATIONS OF FRAUD SHAM LITIGATION

132.    Thereafter, during the period September 2017 and December 2017, which period is both approximate and inclusive, Defendants NYLIM and Siguler, on approximately the same date, commenced action on the same grounds against the Singh Brothers, detailing every fraudulent transaction and putting in public domain.

133.    In addition feigning shock, these litigations carried information only an insider would know and as such its release created a further downward trend on the stock of REL and Fortis Ltd..

40

134.    The entire basis of this litigation was to drive the share price down so the transactions entered into for the REL and Fortis Ltd. shares, would be frustrated on account of the lenders triggering a default and invoking the collateral (in this case the shares).

135.    In support of its stated position the Plaintiff submits that immediately after gaining illegal control of Fortis Ltd. and REL, the enterprise did not pursue any of these litigations and secretively settled them.

## THE ILLEGAL TAKEOVER

136.    As part of the acquisition, Plaintiff's Predecessors, were acquiring shares of REL and Fortis Ltd. that belonged to the family of the Non-Party Defendant, Gurmeet Singh Dhillon through the Non-Party Defendant entities SGGD Projects Development Private Limited and Bestest Developers Private Limited, that, as more fully detailed in Exhibit A, were pledged to Ares SSG and Other lenders.

137.    The bear raid on REL and Fortis Ltd. by the RICO Defendants caused an event of default of the loan covenants of Ares SSG and despite understandings to the contrary, Ares SSG invoked the pledge and sold the shares to Non-Party Defendants, IHF and RIGF. Both "shell" entities controlled by Defendant Bay Capital and Ares SSG.

138.    The illegal short sale which took place was undertaken for only one purpose which was to deny Emqore its contractual rights. Aggrieved the Plaintiff's Predecessors, approached the courts in India between December 12 and 16, 2017, which period is both approximate and inclusive and obtained stay orders against this fraudulent conduct, Ares SSG, Bay Capital using the support of the Singh Brothers, using an imposter, purporting to be a representative of Emqore and / or the Plaintiff's Predecessors, withdrew the litigation.

41

139.    Using a pattern of deception using interstate wires and in breach of the implied covenant of good faith and fair dealing, all of which originated in the United States, despite knowing the restrictions on such a trade on account of the outstanding transaction(s) of Emqore, the RICO Defendants, illegally seized control of REL and Fortis Ltd. in violation of prohibitory orders outstanding in the Daiichi Sankyo case.

140.    Having secretly obtained a controlling position in REL and Fortis Ltd., Defendants became increasingly nervous and saw Emqore as an impediment to accomplishing its Fraudulent Scheme.

## RICO DEFENDANTS CODUCT HIGHLIGHTS A CONTINUING PATTERN OF WRONGDOING

141.    Between the period February 2018 and March 2018, an email communication originating from one TransAct, of Anaheim California, allegedly an "activist" organization, in a salaciously worded mail dated February 1, 2018, informed the bankers of Emqore, that an "investigation was underway into the acquisition of REL and Fortis Ltd. by [Emqore] by regulators and agencies "worldwide" and as a consequence of which funds advanced in furtherance of this activity "could be seized."  It is believed that TransAct, if there was such an organization, was acting under the instructions of the RICO Defendants, and that based on such sentiments being furthered by the RICO Defendants, DBS[18] withdrew the financing to the Plaintiff's Predecessors on February 5, 2021.

142.    In a subsequent email letter of March 11, 2018, addressed to the Indian Agencies, TransAct, wrongly and maliciously accused Emqore of acquiring an interest in REL and Fortis Ltd. that Emqore's acquisition of REL and Fortis Ltd. needed investigation.

---

[18] Offered at the time by DBS predecessor LVB Bank.

143.    In a final email letter dated March 22, 2018, TransAct, addressed to the Regulators, TransAct raised suspicion on the acquisition of an interest in the REL and Fortis Ltd. Brands by Plaintiff's Predecessors. Alleging the underlying transaction(s) to be questionable.

144.    Through these exchanges and on account of other such activity undertaken by the RICO Defendants any and all efforts by Emqore to highlight the illegal conduct of the RICO Defendants, went un-investigated and remains un-investigated to this date. To wit between the periods March 2018, through March 2020, Emqore raised over 96 instances of grievances with the Indian Regulators and Agencies, all of which remain unattended, even while the RICO Defendants files one frivolous complaint after the other.

145.    The conduct of the RICO Defendants qua Emqore is no different from what happened to the judgment to Daiichi Sankyo. Despite a USD 650 MN enforceable order, upheld by the Supreme Court of India, Daiichi Sankyo has collected no more than USD 6.5 MN, that too after years of intense litigation.  Making the victory of Daiichi Sankyo almost pyrrhic and the judgment not worth the paper it is written on.

146.    During the same period the RICO Defendants have collaborated and conspired with the Singh Brothers, to move all valuable assets from the Singh Brother entities, leaving on empty shells. This is no different from what the RICO Defendants have attempted to do here.

147.    In an extremely public meltdown, on August 8, 2018, Defendant Bhavdeep Singh in an attempt to distance himself from the fraud informed the world that he "raised a voice of protest, [but was] overruled," and forced to sign the papers that permitted the Singh Brothers to siphon almost USD 60 MN from Fortis Ltd..

148.    The same Stockholm Syndrome suffering Bhavdeep Singh, then denied signing the binding term sheet with Plaintiff's Predecessors, which was signed by the Brothers Singh in a very

public ceremony. Thereby, adopting a similar strategy that REL had put into play. However, in the case of REL, the then Chairman, when confronted in Switzerland, ratified the Penalty Agreement, which REL had denied existed.

## EMQORE CONSOLIDATES ITS POSITIONS IN THE REL & FORTIS LTD. BRANDS

149.    With a depleting asset base, Plaintiff's acquisition of and / or investment in REL and Fortis Ltd. relied heavily on the brands of these entities[19] which were independently valued at approximately USD 125 MN each.

150.    During the due diligence, Emqore was shocked to that the brands of Fortis Ltd. and REL had been signed away to two of Plaintiff's Predecessors[20] as part of a court ordered settlement under claims of fraud raised against the Singh Brothers and other related parties, in a suit valued at approximately USD 600 MN. Under the structure of the transaction and as part of the understandings underway at the time, Plaintiff's Predecessors agreed to acquire the rights of these two Plaintiff's Predecessors in the REL and Fortis Ltd. brands[21].

151.    Via put option granted by REL[22] and a put option implied in the case of Fortis Ltd.[23] under the terms of the brand "rescue" financing provided by Emqore, the Plaintiff became the rightful beneficiary of the brand repurchase agreements agreed to by REL and Fortis Ltd..

---

[19] The events leading to the consolidation of the Brands by the Plaintiff are detailed in Exhibit C

[20] Participation Finance & Holdings (India) Private Limited and Strategic Credit Capital Private Limited

[21] The transaction has been structured as a transfer of "actional claims" or "chooses in action" and the final movement of the asset shall be subject to all regulatory consent. A transfer of a right to sue requires no official permission, even in India.

[22] Detailed in Exhibit A, put option was granted to eLIve Infotech Private Limited, a subsidiary of Participation Finance & Holdings (India) Private Limited and Strategic Credit Capital Private Limited. The interest in which has been acquired by Emqore.

[23] Detailed in Exhibit B, through the Side Letters executed by the Singh Brothers, which are independent of the binding term sheet which Defendant Bhavdeep denies executing.

152.     However, the RICO Defendants have taken every possible step to ensure that Emqore is unable to exercise its right. To wit - the case of Fortis Ltd. Emqore was providing the financing for Fortis Ltd. to acquire the assets of Non-Party Defendant, RHT Health Trust, a Singapore Listed Real Estate Investment Trust. An entity that had licenses the REL and Fortis Ltd. Brands. Even before the ink on the IHH Berhad transaction was dry and regulatory approval was yet to be received, using the funds from IHH Berhad, on or about July of 2018, Fortis Ltd. immediately acquired the assets of RHT Health Trust. This was done for the sole purpose of ensuring that the Plaintiff's contractual rights were completely eviscerated.

153.     Shortly after this audacious move, under an application filed by Daiichi Sankyo, the Supreme Court of India held that IHH Berhad's purchase of Fortis Ltd. violated the status quo order entered in Daiichi Sankyo Company Limited v. Malvinder Mohan Singh, which required all disclosed assets of the Singh Brothers to remain status quo on the IHH Berhad acquisition of Fortis Ltd.

154.     Emqore had taken extraordinary precaution to ensure that its transactions did not violate the orders in Daiichi Sankyo, had offered far greater investment and a higher per share price. However, the Plaintiff had insisted that the Singh Brothers and other RICO Defendants, pay in the capital they had taken out. The structure provided by the Plaintiff, called for the Singh Brothers to arrange for 100% of the siphoned funds.

155.     The transactions for REL and Fortis Ltd. structured by the RICO Defendants, to defeat the interests of Emqore, have failed to materialize. Bay Capital has failed to raise the capital required for REL, IHH Berhad, has been censured by the Supreme Court of India. The only success the parties have had is that they have avoided sharing prison cells with the Singh Brothers.

156.   As the RICO Enterprise intended, the Defendants' misrepresentations had a twofold effect: First, the illusory change of management the RICO Enterprise knew, would naturally protect their own interests, if not the interests of the other stakeholders. Second, illusory change of control would bolster their false accusations as to the propriety of Emqore's opposition created the appearance of a false conflict between Emqore. The Defendants' actions had the intended effect of stripping Emqore of its valuable contractual rights. The parties and creditors, who previously were willing to negotiate with Emqore, began agitating towards the newly constituted boards and the exclusivity provisions being relied upon by Emqore stood squarely abandoned.

157.   In response to the artificial conflict created by the RICO Enterprise Members, Emqore had already been eviscerated as a result of the Fraudulent Scheme. Notably, after successfully stripping Emqore of its rights the Defendants took steps to ensure that Emqore could never collect on tis debt. In fact the Defendants' behavior here strikingly resembles its conduct in obfuscating the rights of Daiichi Sankyo -- discussed above -- in which the Defendants were willing to play a "long game" to permit the Brothers Singh to encumber all the assets that could be seized by Daiichi Sankyo.

158.   In press release after press release the Defendants cast doubt on Emqore's position qua the brands and the RICO Enterprises falsely accused Emqore of wrongdoing in order to further sabotage Emqore's standing. And even though courts did not pay heed to the noise the value of Emqore's assets, that is the brands, of Fortis and Religare, was deliberately destroyed. The Defendants have a history of abusing the judicial process in courts around the country by committing perjury and destroying evidence to achieve their own ends. These tactics have led numerous courts and regulators to sanction and reprimand some of the RICO Enterprise Members.

46

In the most flagrant abuse of process Religare went ahead and changed the brand name of one of its subsidiaries.

## TOTALITY OF THE SCHEME

159.    The illegally deprived funds that spawned the entities that subsequently undertook gross criminal acts against the Plaintiff originated from criminal conduct in United States associated with the sale of Ranbaxy USA. Without this initial fraud other frauds would not have been possible. In order to then conceal the ongoing criminal enterprise, the Defendants undertook a multitude of transactions and feigned transactions each designed to cover-up Defendants' actions and inactions, obfuscate the facts and deprive Plaintiff and Plaintiff's predecessors, of the benefit of their bargain. Which was essentially a "rinse and repeat" of what the RICO Defendants had been doing with Daiichi Sankyo and are now doing with another group of similarly aggrieved.

160.    The management and control of the racketeering scheme, along with the funds which made the scheme possible, derived in substantial part from Defendants located in the United States[24], which reaped the rewards of the illegal enterprise[25]. In an effort to cover-up Defendants' gross negligence and complicity in a fraud perpetrated by the imprisoned Singh Brothers, the Defendants concocted an illegal fraudulent scheme of their own to conceal their wrongdoing, shirk their responsibility and criminally deprive creditors their rightful dues[26].

[24] The Enforcement Directorate (ED), which is probing the money-laundering charges against REL, Fortis Ltd and the Singh Brothers, has established a diversion of $400-million funds to a subsidiary in Mauritius and then to entities including entities in the United States.
[25] REL also acquired entities in the United States and during that process, the Singh Brothers siphoned funds designated for the purchase of the targets. They once again siphoned funds when those entities were sold. In both these transactions, a number RICO Defendants played a critical role, in identifying, negotiating and concluding the transactions, were aware or should have been aware of the money laundering, which they implicitly aided and abetted.
[26] In both instances, i.e. REL and Fortis Ltd., upon taking over the RICO Defendants falsely and fraudulently claimed that they discovered the fraud that they presided over upon taking over management and control. This material falsity is underscored by the fact that the RICO Defendants had commenced and/or supported actions for fraud by the Singh Brothers, as soon as they found out of the interest of the Plaintiff in REL and Fortis Ltd. and even attempted to undertake transactions to conceal the fraud. Defendants, while proclaiming to be aggrieved and to be activists upon taking control continued, to and still continue to work with close affiliates and confidants of the Singh Brothers.

47

161.    After Plaintiff's Predecessors entered into agreements to purchase certain interests and assets in the Religare entities and the Fortis entities, Plaintiff's Predecessors identified frauds above and beyond the criminal activity of the Singh Brothers.

162.    Plaintiff's Predecessors' discovery of the various Defendants' active roles or complicity in the criminal activity of the Singh Brothers meant that Defendants must cover-up their own involvement or become implicated in the Singh Brothers' scheme.

163.    Upon learning that Plaintiff's Predecessors were discovering Defendants' involvement with the Singh Brothers, Defendants took fraudulent step to cover their involvement in the scheme by filing sham lawsuits against the Singh Brothers, which drove the value of the companies down, reducing the share prices for REL and Fortis Ltd. Defendants sought to cover-up their willful blindness or contrived ignorance relating to the Singh Brothers' fleecing of the entities.

164.    Moreover, Defendants replaced board members of the entities in furtherance of the scheme to shield their involvement with the Singh Brothers from the light of day.

165.    Having driven the value of the entities down and replacing board members, Defendants then illegally reneged on the agreements with Plaintiff's Predecessors and took over control of the Religare and Fortis entities through self-dealing[27].

---

[27] Defendants knew that Plaintiff had been induced into entering into investment/acquisition agreements for REL and Fortis Ltd. In or about February of 2018, Defendants, congregated, conspired and/or otherwise collaborated to change the Board of both REL and Fortis Ltd. and have the criminal promoters, the Singh Brothers step down. The methods employed for the takeover of REL and Fortis Ltd. were starkly similar. In both the cases, the new investor, Defendants, of REL and Fortis Ltd. had either initiated sham litigations with these entities or had determined these entities unfit for investment. Rather, the very public disclosure of the financial fraud of the Singh Brothers, drip fed into the financial system by the RICO Defendants, served to drive down the share price of both REL and Fortis Ltd. In the case of REL the Defendants, including Siddharth Mehta and Sham Maheshwari, initiated litigations in order to drive down the share prices of REL. Defendant Siddharth Mehta formed a coalition with IFC, NYLIM, Siguler, SSG and Bay Capital to then take over REL. In the case of both REL and Fortis Ltd., after the optical change of

166.    Defendants swindled Plaintiff's Predecessors out of the deals because Plaintiff's Predecessors uncovered Defendants' participation in the Singh Brothers' scheme.

167.    The Defendants have criminally deprived the plaintiff of rights to property or illegally appropriated property for the sole purpose of frustrating or otherwise preventing the plaintiff from obtaining its rightful dues. The predicate acts relied upon show a a) consistent violation of securities laws; b) abuse of process; c) fraud; d) trademark infringement; e) theft; f) money laundering; g) wire and mail fraud; h) conspiracy including contrived ignorance and willful blindness; and embezzlement.

168.    The Defendants did it with Daiichi Sankyo, the Defendants perfected it with the Plaintiff and the Defendants are at it again with other creditors. All the predicate acts have an "essential" link to the United States and the first or "initial" offense began in the United States. The extraterritorial application of RICO cannot be in question as the underlying acts have an "extraterritorial application".

169.    REL and Fortis Ltd. and the Singh Brothers were one economic unit and on account of the method or modality of the illegal takeover of these enterprises, the new investor Defendants have both successor and alter ego liability. The transactions are nothing but deemed mergers and for which the liability of these entities must be applied to those in control of the management and affairs.

---

management, the new investor Defendants went ahead and attempted to and did interfere with the binding agreements of Walmark and Loancore, and as part of this exercise, managed, manipulated and/or otherwise orchestrated the denial of the existence of these binding agreements. In each instance, Defendants were fully aware that not only had Walmark and Loancore been fraudulently induced into the transactions with REL and Fortis Ltd., but at the request of Defendants, there was a deliberate attempt to use Walmark and Loancore for other fraudulent activity in order to cover-up the culpability of Defendants.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### (Violations of RICO, 18 U.S.C. § 1962(c))
### (Against All RICO Defendants)

170.  Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

171.  At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

172.  At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

## THE RICO ENTERPRISE

173.  The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in this Complaint; namely, through a multi-faceted campaign of lies, fraud, obstruction of justice, threats and corruption, to coerce Plaintiff into relinquishing their claims. These RICO Defendants and their coconspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States and India, funded primarily with the lawful currency of the United States, and directed mainly from the United States. Over the years they have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities. While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

a) Defendants Malvinder Mohan Singh and Shivinder Mohan Singh have been responsible for oversight of the scheme to defraud and extort the Plaintiff, even while being incarcerated, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, manufacturing evidence of Plaintiff's liability, procuring sham criminal charges against Plaintiff attorneys, conducting a massive public pressure campaign designed to spread false and misleading information about Plaintiff and obstructing Plaintiff's efforts at uncovering the truth in various court proceedings. If this were a Mafia organization, the Singh Brothers, would be the Joint Dons. The criminal activities of the Singh Brothers are no longer in doubt. Imprisoned for embezzlement and money laundering, held for contempt for failing to pay creditors, the Singh Brothers crimes are well documented.

b) Defendant Khazanah, in this organization played the principal role of Joint Underboss, exerting influence over all the major enterprises of the Singh Brothers and colluding with the Singh Brothers, and turning a blind eye for the benefit of the criminal enterprise in which they permitted false statements stockholders, financial analysts, investors, and/or to regulators and agencies. Were it not for the cover of credibility IFC provided the Singh Brothers scams would have been uncovered long before the markets saw approximately USD 10 BN of public value evaporate, across enterprises.

c) Defendants, Shakeeb Alam and Sham Maheshwari, the de fact, Joint Consigliere's organized the illegal takeover of Fortis Ltd. and REL. They frequently used the lawful currency of the United States for this purpose. Were it not for their conduct, neither Fortis nor Religare would have been able to defeat the rights of the Plaintiff. Defendant Sham Maheshwari, particularly enabled the Singh Brothers, to consolidate power over

REL by financing the acquisition of a substantial holding by Non-Party Defendant Gurmeet Singh Dhillon's investment companies. Once in power, the Singh Brothers and Dillion serially plundered the coffers of REL and Fortis Ltd.

d) Defendant Siddharth Dinesh Mehta, the Underboss, enjoyed a closeness to the Singh Brothers which no one else did. He manipulated share prices of their entities to benefit other RICO Members and used his entities to covered laundered funds both from India into lawful currency of the United States and invest funds raised in the United States. Defendant Siddharth Dinesh Mehta, has been responsible for coordinating all the sham litigations and creating other negative publicity about the Plaintiff.

e) Defendants NYLIM and Siguler have been primarily responsible for managing the RICO Defendants' "private army.". With seats on the boards of the major / substantial subsidiaries of REL and Fortis Ltd. together with IFC and others, these defendants frequently caused money to be transferred out of the United States for this purpose and further permitted the siphoning of funds from these listed enterprises to be laundered in the lawful currency of the United States.

f) Defendants DBS and IHH Berhad were recruited to ensure that Daiichi Sankyo and the Plaintiff were unable to exercise their rights.

g) Defendants, Ares, Ares SSG, Bay Capital, East Bridge, Khazanah and Mistui stood to benefit the most from the criminal conduct of the enterprise.

174.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the

"Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

175.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

## PATTERN OF RACKETEERING ACTIVITY

176.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

### *Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951*

177.    At all times material to this Complaint, Plaintiff was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

178.    As described herein, the RICO Defendants have engineered a wide ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, threatened fraudulent civil judgments, investigations by government agencies, and ongoing harassment and disruptions of business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiff.

179.    As described herein, the RICO Defendants manufactured false evidence against Plaintiff and are relying on that false evidence with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiff.

180.    As described herein, the RICO Defendants conspired with the state actors to advance baseless criminal charges against two Plaintiff.

181.    The RICO Defendants' actions are intended to induce fear in Plaintiff that the RICO Defendants will, among other things: (1) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Plaintiff, unless and until Plaintiff "settles" the claims; (2) continue to conspire with officials to have Plaintiff and Plaintiff representatives, affiliates, predecessors or nominees, prosecuted on trumped up charges; and (3) prevent any actions of the Plaintiff from proceeding. These actions, as described herein, have created a reasonable fear of harm on the part of Plaintiff, including fear of economic loss.

182.    Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Plaintiff to consent to relinquish property through the wrongful use of actual and threatened force, violence, and fear including fear of economic harm.

*Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. § 1341, 1343*

183.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiff, various courts of law, and the greater public concerning while pretending to be neutral and distinct from the Singh Brothers, were in fact furthering the ultimate objective of the RICO Defendants' scheme to suppress the claims of the Plaintiff.

184.    In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign

commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

a)  wirings and/or mailings between and among the RICO Defendants concerning the scheme to defraud the Plaintiff;

b)  communications directed toward officials and regulators incorporating false and misleading statements regarding Plaintiff;

c)  funds transferred with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities;

d)  voting in resolutions and other activities germane to their participation in listed companies; and

e)  electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts.

185.    Plaintiff incorporates by reference necessary wire and mail communications needed to pass resolutions by all United States shareholders and the transfers that are undertaken to affect the investment as being in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443, including which individual defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

186.    Specifically, the Plaintiff also relies on the period January 15, 2018 through to February 28, 2018, both being approximate and inclusive when the RICO Defendants with the

feverish use of mailed or wired, when the communication originating from or termination in the United States rallied the RICO Defendant "army" to change the boards of REL and Fortis Ltd.

187.    The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiff into paying the RICO Defendants and their co-conspirators. The RICO Defendants knowingly and intentionally prepared a self-serving analysis of Plaintiff's true status and caused that analysis to be filed under the pretense that it was a report prepared by an independent, when in fact it was authored by the RICO Defendants and knowing these statements to be false or misleading, permitted them to be disseminated to the general public, to the media, and to multiple regulators and agencies, with the intent that those statements be believed and that they form the basis for further public attacks on Plaintiff, investigations of Plaintiff, and reduction in the value of Plaintiff's rights. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Plaintiff such that Plaintiff would ultimately cease their collection activities.

188.    The RICO Defendants' false and misleading statements have been relied on by courts, agencies and regulators, Plaintiff's shareholders, investors, analysts , the media, and their failure to take meaningful corrective action are all instrumentalities of this scheme. Further, RICO Defendants' false and misleading statements have caused Plaintiff substantial damages.

*Pattern of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. ,§_1956*

189.    Defendants have on multiple occasions, acting in their individual capacities and as agents the enterprise knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States other entities with the intent that those funds be used to promote the

carrying on of unlawful activity in violation of 18 U.S.C. §§ 1341, 1343 and 1951, including the change of the board of REL and Fortis Ltd.

### *Pattern of Racketeering Activity: Abuse of Process & Obstruction of Justice in Violation of 18 U.S.C. § 1503*

190.    In a concerted effort to thwart Plaintiff's attempts to uncover the truth and avoid discovery, the RICO Defendants, and their counsel, have habitually filed or caused to be filed documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera. By making these deliberate and strategic false representations in various pending federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

### *Pattern of Racketeering Activity: Fraud, 18 U.S.C. 1341 and 1344; Securities Fraud, Violation of the Exchange Act and 18 U.S.C. § 1512*

191.    Between in or about April 2013 and June 2017, both dates being approximate and inclusive, a majority of the RICO Defendants did devise a scheme to manipulate the financial statements, of REL and Fortis Ltd.

192.    Among the goals of the scheme were:

      a) to ensure that REL and Fortis Ltd. consistently reported that it had met or exceeded projected quarterly results for, among other things, sales revenue;

57

b) to conceal related party transactions and the "evergreening" of related party loans;

c) to artificially increase and maintain the share price of company stock;

d) to maintain and increase the value of the Defendant's position in the company; and

e) to enrich the Defendants through payments of dividends and other incentives

193.    The means by which the defendant and others achieved and attempted to achieve the goals of the scheme included: (a) recognizing revenue on related party contracts/loans that were conditioned to never be paid; (b) showing a healthy loan book when in fact the these loans were sin default from inception; (c) to obfuscate the rights of creditors and to show that the related party loans were for genuine business prospects but were in fact to create encumbrances and liens on assets which Daiichi Sankyo had a charge; (d) concealed from the public the nature of these transactions in violation of prudent accounting policies ; and (e) recognizing revenue on these never to be repaid loans.

194.    In order to validate or sanitize the financial presentations, both in the case of REL and Fortis Ltd. the RICO Defendants, permitted or otherwise approved, (a) the making of fraudulent entries to company books and records at quarter-end; (b) concealing the true nature of the improper revenue-generating transactions from the regulators, ratings agencies and the public at large; (c) making false statements and material omissions to the regulators, ratings agencies and the public at large; (d) filing materially false and misleading financial statements with the exchanges; and (e ) making materially false and misleading public statements about REL's and Fortis Ltd. financial performance.

195.     Between the periods September 2013 and June 2018, the number of transactions, in furtherance of the scheme to criminally deprive the creditors their dues, each of which was furthered by the Singh Brothers and approved by the tacit approval of RICO Defendants, Bhavdeep Singh, IFC, NYLIM and Siguler, included but were not limited to:

## THE A & A CAPITAL SERVICES TRANSACTION

196.     The approval of this loan by REL, in the amount of approximately USD 12.50 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE ABHIRUCHI DISTRIBUTORS TRANSCTION

197.     The approval of this loan by REL, in the amount of approximately USD 11.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE AD ADVERTISING TRANSACTION

198.     The approval of this loan by REL, in the amount of approximately USD 11.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE ANNIS APPAREL TRANSACTION

199.     The approval of this loan by REL, in the amount of approximately USD 11.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for

which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE ARTIFICE PROPERTIES TRANSACTION

200.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE BEST HEALTH MANAGEMENT TRANSACTION

201.    The approval of this loan by REL, in the amount of approximately USD 5.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE BHARAT ROAD NETWORK TRANSACTION

202.    The approval of this loan by REL, in the amount of approximately USD 7.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE DEVERA DEVELOPERS TRANSACTION

203.    The approval of this loan by REL, in the amount of approximately USD 6.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE FERN HEALTHCARE TRANSACTION

204.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE GURUDEV FINANCIAL TRANSACTION

205.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE MODLAND WEARS TRANSACTION

206.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE PLATINUM INFRASTRUCTURE TRANSACTION

207.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE STAR ARTWORK TRANSACTION

208.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for

which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE ROSESTAR TRANSACTION

209.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE TARA ALLOYS TRANSACTION

210.    The approval of this loan by REL, in the amount of approximately USD 10.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE TORUS BUILDCON TRANSACTION

211.    The approval of this loan by REL, in the amount of approximately USD 11.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE TRIPOLI INVESMENT TRANSACTION

212.    The approval of this loan by REL, in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

## THE BEST HEALTHCARE TRANSACTION

213.    The approval of this loan by Fortis Ltd., in the amount of approximately USD 20.00 MN to a Singh Brothers entity, has been recognized as fraud by the investigating agencies in India, for which the Singh Brothers and others are indicted and imprisoned. The transaction was used to siphon funds from a listed entity and to encumber assets of creditors.

214.    The RICO Defendants, Bhavdeep Singh, Singh Brothers, IFC, NYLIM and Siguler and others engaged in improper practices and for each financial reporting period, during September 2013 and June 2018, which period is both approximate and inclusive, every financial statement provided to the exchanges, the regulators, the rating agencies and the public at large was false and misleading. All in violation of Title 18, United States Code, Section 371.

215.    The RICO Defendants and others, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by REL and Fortis Ltd, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing Unify to make untrue statements of material fact and omitting to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of Fortis Ltd. and REL Securities.

### Pattern of Racketeering Activity: Trademark Infringement Lanham Act and violation of 18 U.S.C. § 1114

216.    Plaintiff asserts nine claims in its amended complaint against all Defendants: (1) federal trademark infringement, (2) unfair competition under federal law, (3) dilution of a famous

mark by blurring under the Lanham Act, (4) dilution of a famous mark by tarnishment under the Lanham Act, (5) contributory trademark infringement, (6) federal RICO violations, (7) violation good faith and fair dealing, (8) unjust enrichment, and (9) punitive damages. The RICO Defendants each one of them, publicly and vocally between the periods February 2018 and January 2019, which period is both approximate and inclusive, through regulatory filings, media releases and other such instances, did claim that they intend to and would abandon the brands.

## *Summary of the Pattern of Racketeering Activity Alleged Against Each RICO Defendant*

217.   Defendants Malvinder Mohan Singh and Shivinder Mohan Singh, sowed the seeds of their criminal enterprise in New Jersey.  With complete disregard for human life, concealing the serious defects in their manufacturing facilities in India, the Brothers Singh, used the grossly inflated market presence of Ranbaxy USA unjustly enriched themselves. The activities of the Singh Brothers then and now affected interstate commerce.   The Singh Brothers also engaged in extortion of Plaintiff and fraudulent conduct through numerous acts, including by participating in a number of campaigns and schemes and schemes within schemes to disenfranchise the Plaintiff. In addition, the Singh Brothers have engaged in obstruction of justice, committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States with the intent that such payments would fund the RICO Defendants' criminal activity. The Singh Brothers have also engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward the Plaintiff.

218.   Defendants Sham Maheshwari and Shakeeb Alam have committed numerous mail and wire fraud violations, that has resulted in the extortion of Plaintiff and fraudulent conduct through numerous acts, including by participating in manufacturing false evidence in the form of

statements from the Singh Brothers themselves to ensure a negative outcome for Plaintiff in numerous litigations, and threatening and causing threats to be made to Plaintiff directly and through other RICO Defendants.

219.    Defendant IFC, NYLIM and Siguler have used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. IFC has also engaged in extortion of Plaintiff and fraudulent conduct by participating in the illegal takeover of REL and being part of the consortium that eventually dislodged the binding agreements of the Plaintiff. IFC, NYLIM and Siguler, permitted false testimony in proceedings that would seek to nullify the power of the buyback option granted to the Plaintiff and restrain access to other assets, pledged or encumbered in favor of the Plaintiff.

220.    Defendant Siddharth Dinesh Mehta has committed numerous mail and wire fraud violations, in which Siddharth Dinesh Mehta used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Siddharth Dinesh Mehta has committed wire fraud and engaged in money laundering by knowingly causing the lawful currency of the United States to be transported, transmitted, or transferred in furtherance of the RICO Defendants' criminal activity. Siddharth Dinesh Mehta has also engaged in extortion of Plaintiff and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Plaintiff and by manufacturing and causing to be manufactured false evidence, and by applying pressure to the Indian government officials to procure baseless investigations against the Plaintiffs. In addition, Siddharth Dinesh Mehta has engaged in obstruction of justice by filing or causing to be filed in multiple courts documents, including declarations sworn to under penalty of perjury, that falsely represent causes of action against the Plaintiff.

221.    Defendant Khazanah, IHH, Ares, DBS and Mitsui & Co, through contrived ignorance and willful ignorance of the actions of its agents the other RICO Defendants have committed numerous mail and wire fraud violations, and have engaged in numerous acts of extortion of Plaintiff.

222.    Defendant East Bridge, Bay Capital and Ares SSG have committed numerous mail and wire fraud violations in furtherance of the RICO Defendants' scheme to defraud. East Bridge, Bay Capital and Ares SSG engaged in extortion of Plaintiff and fraudulent conduct by manufacturing false evidence, and more generally in furtherance of their illegal scheme. In addition, East Bridge, Bay Capital and Ares SSG have engaged in extortion and fraudulent conduct by disseminating false statements about Plaintiff and by participating in a campaign of public attacks based on false and misleading statements about Plaintiff and otherwise misrepresenting the relationship between the Plaintiff and other parties.

223.    Defendant RBL, RFL, CHIL and Fortis Ltd. have committed numerous mail and wire fraud violations, in furtherance of the RICO Defendants' scheme to defraud. Beltman also has engaged in extortion of Plaintiff and fraudulent conduct by manufacturing false evidence, in the form, used extensively by the RICO Defendants in furtherance of their illegal scheme. In addition, RBL, RFL, CHIL and Fortis Ltd. have engaged in extortion and fraudulent conduct by disseminating false statements about Plaintiff and also has engaged in extortion of Plaintiff and fraudulent conduct by disseminating and causing to be disseminated false statements to the public and to the regulators and agencies, unleashing astonishing similar schemes in order to disgorge the Plaintiff of its contractual rights.

224.    Each of the RICO Defendants has engaged in multiple predicate acts. The conduct of each of the RICO Defendants described in paragraphs 309 to 338, supra, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (5).

225.    Plaintiff was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962 (c). The injuries to Plaintiff caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Plaintiff's reputation and goodwill; the impairment of Plaintiff's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

226.    Further, these injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victim of the RICO Defendants' unlawful Enterprise. Plaintiff has been and will continue to be injured in its business and property in an amount to be determined at trial.

227.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

228.    Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.


WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))
### (Against All RICO Defendants)

229.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

230.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

231.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962 (d).

232.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

233.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiff. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth.

234.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property, including damage to Plaintiff's reputation and goodwill; the impairment of Plaintiff's interest in executed

contracts, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in India, including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in these proceedings.

235.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

236.    Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—— from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to commence in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## THIRD CLAIM FOR RELIEF
### (Fraud)
### (Against All Defendants)

237.    Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

238.    Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before courts and before heir communications to agencies and officials, and in their communications to investors, analysts, and the media. Each and every Defendant has personally engaged in this conduct, or knew or should

have known that other Defendants were engaged in it on his or her behalf These false representations are detailed throughout this Complaint and include the falsified testimony in the actions presented in the procedural history.

239.    Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material. Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings the courts, pressuring regulators and agencies to pursue investigations of Plaintiff, and propagating false information about Plaintiff to the media.

240.    These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by government agencies and officials, and their failure to take meaningful corrective action.

241.    As a direct, proximate, and foreseeable result of Defendants' fraud, Plaintiff has been harmed, including significant pecuniary, reputational, and other damages. These injuries include significant damage to Plaintiff's reputation and goodwill, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in India, including the attorneys' fees and costs associated with exposing the Defendants' pervasive fraud.

242.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants.

243.    Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—from any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-

judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference With Contract)**
**(Against All Defendants)**

244. Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

245. Defendants are and have been aware of valid and enforceable contracts bestowed upon the Plaintiff and the Defendants have intentionally caused and continued to cause through improper influence and the fabricated testimony, frustrate those contracts, to improperly dictate to the judiciary that Plaintiff not to be entitled to their dues, and to bring criminal charges against Plaintiff's employees only to deny the Plaintiff's its contractual rights.

246. As a direct, proximate, and foreseeable result of these forced breaches, Plaintiff has been forced to defend itself against claims, which has caused significant pecuniary, reputational, and other damages. These injuries include significant attorneys' fees and costs to defend itself against previously-released claims in Ecuador and in related litigation to attempt to enforce these contracts in international arbitration. The imminent and forthcoming breaches will impose further direct, proximate and foreseeable costs upon Plaintiff, including significant damage to Plaintiff's reputation and Plaintiff's attorneys' fees and costs to defend itself and its subsidiaries in recognition and enforcement efforts around the world.

247.   Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants.

248.   Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

249.   Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.


WHEREFORE, Plaintiff prays for judgment as set forth below.


## FIFTH CLAIM FOR RELIEF
### (Trespass to Chattels)
### (Against All Defendants)


250.   As set forth above, the RICO Defendants have engaged in a pattern of extortion, collusion, wrongdoing, and deceit with an intent to interfere with Plaintiff's property, and have benefited and will continue to benefit from the RICO Defendants' criminal scheme through a fraudulent judgment. Through these actions, and by manufacturing false evidence, tampering with testimony, disseminating misleading statements to courts, the public, and government officials, and otherwise engaging in the pressure campaign described in the foregoing paragraphs of this

Complaint, Defendants have intentionally, and without justification or consent, interfered and intermeddled with Plaintiff's use and enjoyment of the proceeds from the sale of the brands that were intended for Plaintiff's business purposes and of its business reputation and goodwill.

251.    Plaintiff has been harmed and the use of its property has been interfered with and disturbed when its property, resources, and funds were necessarily redirected from their intended uses to defend against Defendants' fraudulent actions and misleading media campaign. For example, Plaintiff has been forced by the RICO Defendants' intentional and wrongful conduct to expend funds and resources defending against fraudulent submissions in the Indian courts and responding to false and misleading reports in major media publications and broadcasts which have been induced by the RICO Defendants, and maintaining an ongoing effort to provide accurate information about the Plaintiff and other aspects of the RICO Defendants' fraud to the media and directly to the public.

252.    Plaintiff also has been harmed in that Defendants' conduct has damaged Plaintiff' reputation, thus interfering with Plaintiff's interest in the public goodwill toward it. Public awareness of and positive associations with the Plaintiff and the other brand assets are among Plaintiff's most valuable assets, and Plaintiff has invested substantial resources into those brand names. The RICO Defendants' have intentionally sought to reduce the value of those assets as part of their extortionate scheme.

253.    The harms suffered by Plaintiff are the direct, proximate, and reasonably foreseeable results of the Defendants' acts of intentional interference with Plaintiff's funds and goodwill.

254.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants.

255.     Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.


WHEREFORE, Plaintiff prays for judgment as set forth below.


## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Against All Defendants)


256.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

257.     Defendants seek to deprive the Plaintiff up to USD 300 MN through a fraudulent scheme. Defendants have been and will continue to be unjustly enriched by benefits obtained due to the expectation of an imminent judgment and the forthcoming judgment itself.

258.     Any property that Defendants obtain from Plaintiff will be acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the prosecution of the Plaintiff itself.

259.     Principles of equity and good conscience mandate that this Court prevent Defendants from reaping a multi-million dollar windfall and any benefits arising out of the fraudulent conduct by, among other things, issuing a preliminary and permanent injunction against Defendants that enjoins Defendants, their assignees, and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### (Against All Defendants)

260.     Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

261.     As set forth above, Defendants have committed torts against Plaintiff, including acts of racketeering giving rise to violations of RICO, fraud, tortious interference with contract, trespass to chattels, and unjust enrichment.

262.     Defendants agreed to participate in a common scheme against Plaintiff. Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from Plaintiff. In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

263.   As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against Plaintiff, Plaintiff has been damaged in its business and property, and further damage to Plaintiff's business and property is threatened and imminent. Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants.

264.   Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way  directly or indirectly— in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or  Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action. Plaintiff realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.


WHEREFORE, Plaintiff prays for judgment as set forth below.


## EIGTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)


265.   Plaintiff repeats and realleges each paragraph set forth above as if set forth at length herein. Every contract imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.

266.    The RICO Defendants have acted in bad faith by not giving equal consideration to the interests of Loancore as they have their own interests and wrongfully and intentionally breached the duty of good faith and fair dealing by denying Plaintiff the benefits to which it is entitle.

267.    The breaches of the covenant of good faith and fair dealing have proximately and directly caused damages to Plaintiff.

268.    By reason of the fraudulent acts and fundamentally unfair proceedings described in this Complaint that have given rise to, an actual and justiciable controversy and none of the Plaintiff's assets are safe from the RICO Defendants' fraudulent actions and racketeering activity. The actions of the RICO Defendants on behalf of the Singh Brothers whom they surely represent have damaged and are threatening to continue damaging the Plaintiff. Unless the controversy between the parties is resolved, the Defendants will continue to harm Plaintiff.

269.    Plaintiff has no adequate remedy at law. A declaratory action is necessary and useful in resolving and disposing of the question of whether any imminent judgment or action is enforceable and recognizable, and is the best and most effective remedy for finalizing the controversy between the parties as to this issue and for relieving Plaintiff from the expensive and damaging uncertainty surrounding the pending proceedings.

270.    Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction against Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-

judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## NINTH CLAIM FOR RELIEF
### (Request for Declaratory Judgment)
### (Against All Defendants)

271.   Plaintiff is entitled to a declaratory judgment that will not improperly increase friction between sovereign legal systems or encroach on the proper domain of a foreign court because no court has a right to impose fraudulent acts.

272.   By this claim, Plaintiff seeks a declaratory judgment that any such judicial process by the Defendants is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, state common law principles of comity, and/or on, among others, grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy.

273.   By reason of the fraudulent acts and fundamentally unfair proceedings described in this Complaint that have given rise to, an actual and justiciable controversy and none of the Plaintiff's assets are safe from the RICO Defendants' fraudulent actions and racketeering activity. The actions of the RICO Defendants on behalf of the Singh Brothers whom they surely represent have damaged and are threatening to continue damaging the Plaintiff. Unless the controversy between the parties is resolved, the Defendants will continue to harm Plaintiff.

274.   Plaintiff has no adequate remedy at law. A declaratory action is necessary and useful in resolving and disposing of the question of whether any imminent judgment or action is

enforceable and recognizable, and is the best and most effective remedy for finalizing the controversy between the parties as to this issue and for relieving Plaintiff from the expensive and damaging uncertainty surrounding the pending proceedings.

275.    Plaintiff is further entitled to, and should be awarded, a preliminary and permanent injunction against Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.


WHEREFORE, Plaintiff prays for judgment as set forth below.


## SUMMARY OF DAMAGES

In the interest of justice, the Plaintiff is removing all the controversies and controversial contracts in the calculation of the damages. The RICO Defendants would want nothing more than to color these proceedings and deflect from their wrong doing.


Summary of Reasonable Counsel's Fees:          TBA


Summary of Consequential Damages:          TBA

Summary of Actual Damages (partial list):

| | |
|---|---|
| costs trademark protection | $48,000,000.00 |
| triple damage multiplier (3x) | $144,000,000.00 |
| unpaid professional invoices: | $   450,350.00 |
| triple damage multiplier (3x): | $   1,351,050.00 |
| trademark infringements, actual: | $180,000,000.00 |
| triple damage multiplier (3x): | $540,400,000.00 |
| trademark infringements, losses: | $180,000,000.00 |
| triple damage multiplier (3x): | $540,000,000.00 |
| | |
| Subtotal: | $1,632,450,350.00 |
| Summary of Punitive Damages (3x): | $ 4,897,355,946.00 |
| TOTAL DAMAGES (minimum): | $ 6,529,806,296.00 |

The damage matrix is three-dimensional: for each Defendant, there are actual, consequential, and punitive damages (3 columns) on each of three counts (3 rows).

## PRAYER FOR RELIEF

1. On the First and Second Claims for Relief

a) That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were

associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

b) That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

c) That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in COUNT ONE supra.

d) That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

e) That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

f) That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

g) That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

h) That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $150.00 per hour worked (Plaintiff's standard professional rate at start of this action).

i) That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [sic], for the benefit of Plaintiff, His heirs and assigns.

j) A declaration that the Defendants one and all are liable for the conduct of the Singh Brothers.

k) That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.


2. On the First through Eighth Claims for Relief:

a) That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

b) For general damages according to proof at trial.

c) For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction

that bars Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or coventurer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action.

3.  Only for the third, fourth, fifth, seventh and eighth claims for relief, punitive damages in an amount to be proven at trial.

4.  On the Ninth Claim for Relief:

a)  Equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with the from commencing, prosecuting, or advancing in any way—directly or indirectly—in any court, tribunal, or administrative agency in any jurisdiction, in the United-States or abroad, including any attempt to attach or seize any Plaintiff or Plaintiff subsidiary's or coventurer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiff's claims against the Defendants in this action, or until such time as this Court deems appropriate.

5.  As to All Causes of Action:

a)  For such other legal and equitable relief as the Court may deem Plaintiff entitled to receive.


**LIST OF EXHIBITS**

Pursuant to 18 U.S.C. 1961(9), Plaintiff now formally incorporates His documentary material by reference to all of the following Exhibits, as if set forth fully here, to wit:


Exhibit "A"  List of Dates & Events, REL Transaction

Exhibit "B" List of Dates & Events, Fortis Ltd. Transaction

Exhibit "C" List of Dates & Events, Brand Consolidation


ALFRED V. GELLENE, ESQ.
41 Vreeland Ave.
Totowa, NJ 07512
973-837-8002
973-425-5244 Fax
Algellene@gmail.com


Dated: May 23, 2021                    /s/    Alfred V. Gellene
                                       ALFRED V. GELLENE